**CISPES (COMMITTEE IN SOLIDARITY WITH the PEOPLE of EL SALVADOR), et al., Plaintiffs-Appellants,**

v.

**FEDERAL BUREAU OF INVESTIGATION, et al., Defendants-Appellees.**

No. 84–3507.

United States Court of Appeals, Fifth Circuit.

Sept. 9, 1985.

Andrew Weltchek, Brooklyn, N.Y., William P. Quigley, New Orleans, La., plaintiffs-appellants.

Gilbert R. Buras, Asst. City Atty., William F. Baity, Asst. U.S. Atty., New Orleans, La., for defendants-appellees.

Before CLARK, Chief Judge, BROWN and POLITZ, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

In this appeal, we are asked to invalidate a United States statute as placing an unconstitutional burden on First Amendment freedoms. We hold that the statute, designed to protect foreign dignitaries and officials, is neither vague nor overbroad, and that it is a facially permissible means of protecting an important governmental interest. We further hold that, in view of our construction of the statute, and the government's repeated assertions that it will not be applied to prevent any constitutionally protected activity by the appellants, we need not remand the case for a determination of whether it has been or might in the future be unconstitutionally applied to appellants. We thus affirm the district court's dismissal of all claims of appellants.

### Background

This litigation arises out of the protesting activities of the members of the Committee in Solidarity with the People of El Salvador (CISPES).[1] On July 22, 1982, members of CISPES went to the Honduran Consulate in New Orleans, Louisiana, in order to protest alleged activities of the Honduran government in El Salvador. Two days earlier, appellee Sgt. Joseph Orticke of the New Orleans Police Department had received an anonymous phone call informing him that CISPES members might attempt to seize the Honduran Consulate. Accordingly, he informed the Federal Bureau of Investigation. On July 22, FBI Agents Walton and Hayes were dispatched to the Consulate, along with Sgt. Orticke.

When the CISPES members arrived in the building housing the Consulate on July 22, they asked to speak to the Consul. The Consul agreed to speak to them, at which time one of the CISPES members read a prepared statement. Thereafter, several CISPES members peppered the Consul with questions regarding actions of the Honduran government. At the same time, another CISPES member began taking pictures of the entire Consulate and everyone inside. All of this activity took place inside the Consulate itself. After the Consul agreed to deliver CISPES' statements to his government, the CISPES members left the Consulate and began picketing activities in front of the main entrance to the building housing the Consulate. Shortly thereafter, Agent Hayes of the FBI approached the group and told them that they were violating 18 U.S.C. § 112[2] by virtue

---

1. We state the facts as recited in the district court's memorandum opinion.

2. **§ 112. Protection of foreign officials, official guests, and internationally protected persons**
(a) Whoever assaults, strikes, wounds, imprisons, or offers violence to a foreign official, official guest, or internationally protected person or makes any other violent attack upon the person or liberty of such person, or, if likely to endanger his person or liberty, makes a violent attack upon his official premises, private accommodation, or means of transport or attempts to commit any of the foregoing shall be fined not more than $5,000 or imprisoned not more than three years, or

of their activities. Although the CISPES members initially complied with the agent's request and moved their protest across the street, they soon returned, and were again informed of the applicability of the statute to their activities. After asking several questions regarding the meaning of the statute, the protesters disbanded. None of the protesters, however, was arrested.

Plaintiffs filed a complaint on September 29, 1982, seeking a temporary restraining order and permanent injunction against the enforcement of 18 U.S.C. § 112(b), a declaratory judgment as to its constitutionality, as well as damages, costs, and attorney's fees. After a hearing on October 1, 1982, at which all parties were present, the plaintiffs' TRO request was denied, the court citing a lack of evidence to support the conclusion that the statute would be unconstitutionally applied to plaintiffs in the future.

On January 13, 1984, the parties filed, pursuant to court request, cross-motions for summary judgment under F.R.Civ.P. 56. Plaintiffs requested a judgment that §§ (b)(1), (b)(2) and (b)(3) of the statute be declared unconstitutional on their face. The defendants' motions requested summary judgment in their favor, and dismissal of the action. On June 29, 1984, the district court entered its opinion. Therein, after considering the terms of the statute, the court determined that it was not unconstitutional, and denied plaintiffs' summary judgment motion. The court also granted summary judgment in favor of the defendants, and dismissed all plaintiffs' claims against all defendants.

On appeal, plaintiffs raise several challenges. They continue their challenge to the facial validity of the statute. They also assert that even assuming the district court correctly determined the statute's facial validity, it erred in dismissing plaintiffs' other

both. Whoever in the commission of any such act uses a deadly or dangerous weapon shall be fined not more than $10,000 or imprisoned not more than ten years, or both.
(b) Whoever willfully—
(1) intimidates, coerces, threatens, or harasses a foreign official or an official guest or obstructs a foreign official in the performance of his duties;
(2) attempts to intimidate, coerce, threaten, or harass a foreign official or an official guest or obstruct a foreign official in the performance of his duties; or
(3) within the United States but outside the District of Columbia and within one hundred feet of any building or premises in whole or in part owned, used, or occupied for official business or for diplomatic, consular, or residential purposes by—
(A) a foreign government, including such use as a mission to an international organization;
(B) an international organization;
(C) a foreign official; or
(D) an official guest;
congregates with two or more other persons with intent to violate any other provision of this section;
shall be fined not more than $500 or imprisoned not more than six months, or both.
(c) For the purpose of this section "foreign government", "foreign official", "internationally protected person", "international organization", and "official guest" shall have the same meanings as those provided in section 1116(b) of this title [18 USCS § 1116(b)].

(d) Nothing contained in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the first amendment to the Constitution of the United States.
(e) If the victim of an offense under subsection (a) is an internationally protected person, the United States may exercise jurisdiction over the offense if the alleged offender is present within the United States, irrespective of the place where the offense was committed or the nationality of the victim or the alleged offender. As used in this subsection, the United States includes all areas under the jurisdiction of the United States including any of the places within the provisions of sections 5 and 7 of this title [18 USCS §§ 5 and 7] and section 101(34) of the Federal Aviation Act of 1958, as amended (49 U.S.C. 1301(34) [49 USCS § 1301(34)].
(f) In the course of enforcement of subsection (a) and any other sections prohibiting a conspiracy or attempt to violate subsection (a), the Attorney General may request assistance from any Federal, State, or local agency, including the Army, Navy, and Air Force, any statute, rule, or regulation to the contrary, notwithstanding.
(June 25, 1948, ch. 645, § 1, 62 Stat. 688; Aug. 27, 1964, P.L. 88–493, § 1, 78 Stat. 610; Oct. 24, 1972, P.L. 92–539, Title III, § 301, 86 Stat. 1072; Oct. 8, 1976, P.L. 94–467, § 5, 90 Stat. 1999.)

claims, since the question still remained as to the constitutionality of the statute as applied.

### The Statute

The statute, in its present formulation, is a legislative effort to implement various international obligations of the United States government.[3] Originally enacted in 1948, the law was substantially amended in 1972 and 1976. The legislative history of the 1976 amendments [4] makes explicit reference to two conventions signed by the United States.[5] These conventions are intended to protect foreign officials and diplomats from various terroristic acts, including murder, kidnapping and assault, and threats or attempts to commit such acts. *See* 1976 U.S.Code Cong. & Ad.News at 4480, 4482. Pursuant to these conventions, and in recognition of the special problems regarding the safety and protection of foreign officials, Congress enacted the provisions which we today review.

### Vagueness and Overbreadth

We consider first the appellants' challenge to subsections (b)(1) and (b)(2) of the statute, which make it a crime to coerce, threaten, intimidate, harass, or obstruct or attempt to do the same to certain protected foreign officials. Appellants assert that these provisions are facially unconstitutional, emphasizing the twin infirmities of vagueness and overbreadth. These concepts are, of course, logically related and similar. *See, e.g. Kolender v. Lawson*, 461 U.S. 352, 359, n. 8, 103 S.Ct. 1855, 1859, n. 8, 75 L.Ed.2d 903 (1983). Indeed, some commentators have considered them indistinguishable. *See, e.g.*, Note, *The Void for Vagueness Doctrine in the Supreme Court*, 109 U.Pa.L.Rev. 67, 110–13 (1960).

Nevertheless, the Supreme Court has suggested that in cases involving a facial challenge to the overbreadth and vagueness of a statute, a court should first consider whether the statute is overbroad, and, assuming it is not, then whether it is unconstitutionally vague. *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). *See also Tobacco Accessories v. Treen*, 681 F.2d 378, 381 (5th Cir.1982). We adopt this approach here.

### Overbreadth

■ The vice of an overbroad statute in the First Amendment context is that "persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions by a statute susceptible of application to protected expression." *Gooding v. Wilson*, 405 U.S. 518, 521, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972). Thus, the concern with an overbroad statute stems not so much from its application to completed conduct, but rather from the possibility that the threat of its application may deter others from engaging in otherwise protected expression. *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

■ However, just as an overbroad statute sweeps within its ambit protected as well as unprotected conduct, invalidation of a statute on overbreadth grounds risks total judicial abrogation of an otherwise valid and rational legislative scheme. As the Supreme Court has recognized, a statute need not fall *in toto* merely because it is capable of some unconstitutional applications. *Broadrick v. Oklahoma*, 413 U.S.

---

**3.** *See supra,* n. 2.

**4.** House Judiciary Committee, Act for the Prevention and Punishment of Crimes Against Internationally Protected Persons, H.R.Rep. No. 94–1614, *reprinted in* 1976 U.S.Code Cong. & Ad.News 4480.

**5.** The two, "Convention to Prevent and Punish the Acts of Terrorism Taking the Form of Crimes against Persons and Related Extortion that are of International Significance," adopted by the Organization of American States, and the "Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons" adopted by the United Nations, were part of an international effort to deal with terrorists acts directed at diplomats.

601, 614, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973).

■ The Supreme Court in *Broadrick* recognized the danger of unbridled use of the overbreadth doctrine, and warned that its application is "strong medicine," to be employed "sparingly and only as a last resort." *Id.* at 613, 93 S.Ct. at 2916. As a result, in order to invalidate a statute on overbreadth grounds, the overbreadth "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick,* 413 U.S. at 615, 93 S.Ct. at 2918. Thus, a statute should not be invalidated for overbreadth unless it reaches a substantial number of permissible activities. *New York v. Ferber,* 458 U.S. 747, 771, 102 S.Ct. 3348, 3362, 73 L.Ed.2d 1113 (1982).

■ An important corollary of the "substantial overbreadth" test is that a federal court, faced with the challenged overbreadth of a federal statute, must construe the statute to avoid constitutional infirmities, if such a construction is possible. *See, e.g., New York v. Ferber,* 458 U.S. at 769, note 24, 102 S.Ct. at 3361, n. 24. We believe such a construction is justified here, and that it operates to preserve the statute from overbreadth invalidation.

■ The major objection to the statute raised by appellants is that, in attempting to protect foreign officials, the statute also prohibits such constitutionally protected activities as picketing and demonstrating. These activities are, of course, protected forms of expression. As the Supreme Court stated in *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), "There is no doubt that as a general matter peaceful picketing and leafletting are expressive activities involving speech protected by the First Amendment." *Id.* at 176, 103 S.Ct. at 1707, *citing Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65

L.Ed.2d 263 (1980). We are unconvinced, however, that the statute here was intended to, or will in the future, be read as prohibiting such protected expression.

First and foremost, the legislative history of the statute makes clear Congress' concern for, and desire to protect rights guaranteed by the First Amendment. Indeed, one of the changes made by the 1976 amendments was clearly designed to remove any question regarding the applicability of the statute to pickets and protests which did not otherwise violate the statute. As it existed prior to 1976, 18 U.S.C. § 112(c) provided criminal penalties for anyone who, within 100 feet of a building owned, occupied or used by a foreign government or official,

> (1) parades, pickets, displays any flag, banner, sign, placard, or device, or utters any word, phrase, sound or noise, for the purpose of intimidating, coercing, threatening, or harassing any foreign official or obstructing him in the performance of his duties, or

> (2) congregates with two or more persons with the intent to perform any of the aforesaid acts * * *."

1976 U.S.Code Cong. & Ad.News at 4484 (footnote omitted).

As its reason for removing the language referring to parades, pickets, displays, etc., the committee report stated:

> This language raises serious constitutional questions because it appears to include within its purview conduct and speech protected by the First Amendment. The Committee is of the opinion that its new language is not objectionable on First Amendment grounds.

1976 U.S.Code Cong. & Ad.News at 4484, n. 9. Thus, the 1976 amendments appear to have been intended to remove the very infirmity appellants assert here.[6]

---

6. The cited provisions deal directly with activity only within 100 feet of protected buildings, a restriction currently found in subsection (b)(3) of the statute. Appellants' overbreadth and vagueness challenges are directed at subsections (b)(1) and (2), which have no such limitation.

However, a congressional intent that certain activities be permitted even within the obviously more critical 100 foot perimeter, applies with even more force to the more general restrictions contained in the statutory provisions in question here.

■ An even more exact expression of Congress' intent to preserve First Amendment freedoms is found in subsection (d) of the statute, which provides that:

> nothing contained in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States.

Of course, such a provision cannot substantively operate to save an otherwise invalid statute, since it is a mere restatement of well-settled constitutional restrictions on the construction of statutory enactments. However, it is a valuable indication of Congress' concern for the preservation of First Amendment rights in the specific context of the statute in question. Thus, it serves to validate a construction of the statute which avoids its application to protected expression.

We also observe that the trial judge below apparently did not interpret the statute in question as prohibiting peaceful demonstrations. At the original TRO hearing in this action, appellants asserted their intention to return to the Consulate for further protests. Far from indicating that this activity was prohibited by the statute, the trial judge specifically stated that he assumed appellants would demonstrate in a peaceful manner. He further indicated that he did not assume that appellants would break the law in so doing. Record, Vol. 3 at p. 261. Thus, the court below seems to have construed the statute in the same manner which we do today.

Moreover, the United States Attorney's office involved in this litigation has clearly stated that peaceful picketing is not prohibited by the statute. In responding to appellants' initial motion for a TRO, the United States Attorney's memorandum stated "the statute challenged in this [action] does not preclude public demonstration within 100 feet of the Honduran Consulate." Record, Vol. 1 p. 31. This interpretation of the statute by an official charged with its enforcement further substantiates our conclusion that the statute does not prohibit all protests and demonstrations. We also believe this construction removes the most significant possible unconstitutional interpretation of the statute. Simply put, the statute does not on its face prohibit peaceful demonstrations, protests, and other communicative and expressive activities of a peaceful nature, which do not otherwise violate the statute, even when directed at foreign officials protected under the statute.

We find no merit in appellants' argument that the questioned statute impermissibly regulates the content of speech. It is a well accepted and an oft-repeated doctrine that "regulations which permit the government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Regan v. Time*, 468 U.S. ——, ——, 104 S.Ct. 3262, 3267, 82 L.Ed.2d 487 (1984); *but see Perry Education Association v. Perry Local Education Association*, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794, 103 S.Ct. 948 (1983) (to enforce a content based exclusion, the state must show that its regulation is necessary to serve a compelling state interest, and that it is narrowly drawn to achieve that purpose). However, the statute here does not permit the government to discriminate on the basis of the content of expression. To the extent that it applies at all to protected conduct, it is not a restriction on any particular message. It merely proscribes actions of a threatening or intimidating nature directed at any protected official, and First Amendment rights are affected only to the extent that their exercise might serve to create such intimidation, etc.

■ So considered, we believe the statute is an appropriate and necessary means of addressing the undeniably important governmental interest of protecting foreign officials and visitors. As was observed in relation to a similar statute protecting diplomatic personnel in Washington, D.C.:

> The paramount governmental interest here, ... is the obligation of the United States to protect the persons and property of the diplomatic and consular representatives of a foreign state. That obli-

gation is undisputed in international law, and the statute here was passed pursuant to Congress' power to "define and punish ... offenses against the Law of Nations...." [*citing* U.S. Const., Art. 1, § 8, cl. 10]. This is not only an obligation of the United States, but it is subject to enforcement by foreign states under principles of comity and reciprocity—or denial thereof.

*Jewish Defense League, Inc. v. Washington,* 347 F.Supp. 1300, 1301 (D.D.C. 1972).

The statute here is a narrowly drawn means of protecting this important interest. Any incidental restriction on First Amendment rights is no greater "than is essential to the furtherance of that interest." *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).

Although situations might be imagined in which the statute could be improperly applied, such does not justify striking down the law *in toto*. As the Supreme Court observed in the context of the overbreadth doctrine,

> Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe....

*Broadrick v. Oklahoma,* 413 U.S. at 615, 93 S.Ct. at 2917–18.

■ Thus, we need not refute any and every theoretical case which might constitute an impermissible application of the statute.[7] Our concern in evaluating the facial overbreadth of the statute is whether the threat of its application may deter others from engaging in otherwise protected expression. *Gooding v. Wilson,* 405 U.S. 518, 521, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). In light of our construction here,

we do not fear that the statute risks such a chilling effect on protected expression.

## Vagueness

■ We consider next appellants' vagueness challenge. Appellants assert that sections (b)(1) and (b)(2) are unconstitutionally vague due to the use of the terms "intimidate," "harass," "coerce," "threaten," and "obstruct." They argue that these terms do not sufficiently identify what conduct is prohibited, and that they permit undue discretion on the part of enforcing authorities. We disagree.

The vagueness test was summarized by the Supreme Court in *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983):

> [T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.

*Id.* at 357, 103 S.Ct. at 1858. While the doctrine is concerned with both notice and enforcement, the Court has recognized that fear of arbitrary enforcement is the more important consideration. *Id.* at 358, 103 S.Ct. at 1858. Where the statute fails to provide minimum guidelines for enforcement, it may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Smith v. Goguen,* 415 U.S. 566, 575, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605 (1974).

It is also well settled that

> Where a statute's literal scope ... is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts.

*Smith,* 415 U.S. at 573, 94 S.Ct. at 1247.

We do not believe, however, that any unconstitutional evils infect the statutory

---

7. As the Supreme Court has observed, the more proper course to follow where a criminal law is applied against protected conduct is not to invalidate the law, but rather to reverse the particular conviction. *New York v. Ferber,* 458 U.S. 747, 773, 102 S.Ct. 3348, 3363, 73 L.Ed.2d 1113 (1982), citing *Edwards v. South Carolina,* 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

provisions in question here. The courts have expressly or implicitly upheld the use of these allegedly vague terms in various cases. In *International Society for Krishna Consciousness v. Eaves*, 601 F.2d 809 (5th Cir.1979), this court directly addressed vagueness challenges to the terms "coerce" and "obstruct," and, with little discussion or difficulty, concluded that both were constitutionally sound. *Id.* at 831. In *Cameron v. Johnson*, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968), the Supreme Court said that the term "obstruct," used in a statute prohibiting "picketing ... in such a manner as to obstruct or unreasonably interfere with free ingress or egress to or from any ... courthouse" was "plainly" not vague. *Id.* at 616, 88 S.Ct. at 1338; *see also Eaves*, 601 F.2d at 831.

In *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664, the Court found constitutional on its face the statute making it a crime to threaten the life of the President, recognizing the important distinction between "threats" and protected speech. *Id.* at 707, 89 S.Ct. at 1401 (upholding 18 U.S.C. § 871(a) on its face, but not as applied). And, in *Youngdahl v. Rainfair*, 355 U.S. 131, 78 S.Ct. 206, 2 L.Ed.2d 151 (1957), the Court, while not discussing the vagueness concept, did uphold the power of a state court to enjoin intimidating and threatening activities on the part of striking employees.

While we find no cases specifically deciding the vagueness *vel non* of the term "harass," we are satisfied that it is sufficiently precise to avoid its facial invalidation. Although the term considered on its own might otherwise arguably present a possibility of arbitrary and discriminatory enforcement, we must remember that the objective is not the "wholly consistent academic definition of abstract terms." *American Communications Association v. Douds*, 339 U.S. 382, 412, 70 S.Ct. 674, 691, 94 L.Ed. 925 (1950). When considered in the context of the rest of the statute, especially as we have construed it, *supra*, the meaning and scope of the word becomes clear. It applies to such activities as may seriously alarm or persecute foreign officials.

Moreover, any prosecution under the statute requires that the violator be shown "willfully" to have performed one of the proscribed acts, a requirement which serves both to further restrict any arbitrary enforcement of the statute, and to reduce the likelihood of conviction for a good faith exercise of expressive rights. *See, e.g., American Communications Association*, 339 U.S. at 412–13, 70 S.Ct. at 691.

Finally, as to whether or not people of common intelligence must necessarily guess at the meaning of these words, *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926), we point out that similar terms have been used and applied in numerous United States statutes.[8] These terms are

---

**8.** *See, e.g.,* 18 U.S.C. § 241, which makes criminal a conspiracy by two or more persons "to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment" of any of his constitutional rights. This section withstood a vagueness challenge in *United States v. Guest*, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966).

Similarly, 42 U.S.C. § 1971(b) (under the Voting Rights Act) provides in part, "No person ... shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote...."

42 U.S.C. § 2000a–2 (part of the Civil Rights Act of 1964) provides that "No person shall ... (b) intimidate, threaten, or coerce, or attempt to intimidate, threaten or coerce any person with the purpose of interfering with any right or privilege secured by section 201 or 202" [prohibiting discrimination or segregation in places of public accommodation].

42 U.S.C. § 3617 makes it unlawful, under the Fair Housing Act, "to coerce, intimidate, threaten, or interfere with any person in the exercise of enjoyment of [any rights protected under the Act]."

Finally, under 47 U.S.C. § 223, it is illegal to make an interstate telephone call "without disclosing [your] identity and with intent to annoy, abuse, threaten, or harass any person at the called number." The language in this statute was found sufficiently narrow to withstand a vagueness challenge in *United States v. Lampley*, 573 F.2d 783 (3d Cir.1978).

Of course the mere existence of these terms in the cited statutes is not determinative of their

obviously widely used and commonly understood in statutory contexts. "It is not necessary for the lawmaker ... to define words in common usage if the statute uses them according to their everyday meaning, not as terms of art." *Kramer v. Price*, 712 F.2d 174, 179 (5th Cir.1983) (Rubin, J., dissenting), *aff'd on other grounds on reh'g*, 723 F.2d 1164 (5th Cir.1984) (en banc).

Thus, while we do not doubt that "the imagination can conjure hypothetical cases in which the meaning of these terms will be [a] nice question," *American Communications*, 339 U.S. at 412, 70 S.Ct. at 691, we do not believe they facially offend the concepts of notice and specificity with which the vagueness doctrine is concerned. As the Supreme Court has so perceptively observed, "condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. at 110, 92 S.Ct. at 2300. The challenged provisions are sufficiently certain to withstand appellants' vagueness attack.

### Freedom of Assembly

█ Appellants also contend that the statute unconstitutionally infringes on their right freely to assemble, by virtue of section (b)(3), which prohibits the congregation of any two or more persons within 100 feet of any protected building with intent to violate any provision of the statute. This challenge must fail as well. Initially, we point out that our construction of the statute, *supra*, to permit peaceful demonstrations, even within the 100 foot perimeter, obviates much of appellants' complaint here. We also emphasize that, with respect to appellants' assertion that the statute prohibits any assembly within the 100 foot proscription, the U.S. Attorney has expressly stated, on the record in this case, that "by the very language of statute, plaintiff is not in violation simply by merely congregating within 100 feet of the consu-

late," Vol. 1, record at p. 29, so there is no threat of improper enforcement.

Thus, the statute does not prevent simple peaceable assembly for the purpose of lawful discussion, which of course, cannot be made a crime. *DeJonge v. Oregon*, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937). It merely prohibits an assembly of persons with the specific intent to commit the offenses which we have held *supra*, the government may constitutionally proscribe, and then only within 100 feet of a protected building. As the Court said in *DeJonge*,

> The question, if the rights of free speech and peaceable assembly are to be preserved, is not as to the auspices under which the meeting is held, but as to its purpose; .... If the persons assembling ... have formed or are engaged in a conspiracy against the public peace and order, they may be prosecuted for their conspiracy or other violation of valid laws.

*Id.* at 365, 57 S.Ct. at 260.

To the extent that the challenged provision, as construed, operates to restrict any First Amendment rights, it is easily sustainable as a reasonable time, place and manner restriction. Such restrictions are permissible, so long as they are content-neutral, serve a significant governmental interest, and leave open ample alternative channels of communications. *See, e.g.,* *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 1708, 75 L.Ed.2d 736 (1983). As we have already discussed, the restrictions here are content-neutral, *see supra,* p. 474 and serve a significant governmental interest, *supra,* at pp. 474–75. Given our conclusion that the statute does not prohibit peaceful demonstrations, even within the 100 foot perimeter, it can hardly be argued that the restriction against congregating with intent to violate the statute fails to leave "ample alternative channels of communication."

---

constitutionality. But their common usage, and the application of these statutes in numerous cases, is evidence that the terms have a general-

ly accepted meaning, and are not constitutionally suspect.

In fact, the courts have upheld much more extensive restrictions on the rights of speech and assembly than those imposed here. In *Frend v. United States*, 100 F.2d 691 (D.C.Cir.1938), *cert. denied*, 306 U.S. 640, 59 S.Ct. 488, 83 L.Ed. 1040 (1939), the District of Columbia Circuit upheld against constitutional attack a statute,[9] still in force in the District of Columbia, prohibiting any congregation of people within 500 feet of any building used by foreign governments or representatives.[10] Likewise, in *Concerned Jewish Youth v. McGuire*, 621 F.2d 471 (2d Cir.1980), *cert. denied*, 450 U.S. 913, 101 S.Ct. 1352, 67 L.Ed.2d 337 (1981), the Second Circuit upheld as a reasonable time, place and manner regulation a New York City policy of restricting protests at the Russian Mission there by permitting a maximum of 12 protestors, all of whom had to stand within a small "bullpen" area over 100 feet from the Mission.

We hold the statute achieves a nice, and permissible, balance between freedom of expression and the important governmental interests which exist here. As Justice Blackmun observed:

Although American constitutional jurisprudence, in the light of the First Amendment, has been jealous to preserve access to public places for purposes of free speech, the nature of the forum and the conflicting interests involved have remained important in determining the degree of protection afforded by the Amendment to the speech in question.

*Lehman v. City of Shaker Heights*, 418 U.S. 298, 302–03, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974) (Blackmun, J., plurality opinion).

### Dismissal of Appellant's Claims

■ Having determined the statute to be facially valid, it remains to consider the propriety of the district court's dismissal of all appellants' claims in the case. Appellants argue that the summary judgment motion before the court below addressed only the facial validity of 18 U.S.C. § 112(b)(1), (2) and (3), and that the district court erred in dismissing all their claims, since the question of the validity of the statute as applied to them remained to be litigated. We disagree.

Quite simply, we believe that, in light of our ruling today, there is nothing left of this case. The essence of appellants' requested relief is that the statute be declared unconstitutional, and that defendants be enjoined from unconstitutionally interfering with appellants' First Amendment rights. Today's ruling of course disposes of the statutory argument.

As to appellants' request that defendants be enjoined from enforcing the statute in

---

**9.** D.C.Code:

§ 22–1115. *Interference with foreign diplomatic and consular offices, officers, and property.*

It shall be unlawful to display any flag, banner, placard, or device designed or adapted to intimidate, coerce, or bring into public odium any foreign government, party, or organization, or any officer or officers thereof, or to bring into public disrepute political, social, or economic acts, views, or purposes of any foreign government, party, or organization, or to intimidate, coerce, harass, or bring into public disrepute any officer or officers or diplomatic or consular representatives of any foreign government, or to interfere with the free and safe pursuit of the duties of any diplomatic or consular representatives of any foreign government, within five hundred feet of any building or premises within the District of Columbia used or occupied by any foreign government or its representative or representatives as an embassy, legation, consulate or for other official purposes, except by, and in accordance with, a permit issued by the superintendent of police of the said District; or to congregate within five hundred feet of any such building or premises, and refuse to disperse after having been ordered so to do by the police authorities of the said District. (Feb. 15, 1938, 52 Stat. 30, ch. 20, § 10.)

**10.** While we recognize that the case was decided almost 50 years ago, before the development of much modern First Amendment doctrine, we also observe that the same statute has much more recently withstood attempts to prospectively enjoin its enforcement. *See Jewish Defense League, Inc. v. Washington*, 347 F.Supp. 1300 (D.D.C.1972) and *Jews for Urban Justice v. Wilson*, 311 F.Supp. 1158 (D.D.C.1970).

an unconstitutional manner, our holding, and the record below, establish as a matter of law that appellants could not succeed in securing a preliminary injunction here. To do so, they would have to show, *inter alia,* a substantial threat of irreparable injury if the injunction is not issued. *Apple Barrel Productions, Inc. v. Beard,* 730 F.2d 384, 386 (5th Cir.1984). In light of (a) the U.S. Attorney's statements that the statute does not prohibit peaceful demonstrations, and (b) our like construction of the statute, we fail to see any threat of injury to appellants' constitutional rights sufficient to meet the standards for such prospective relief.

Appellants have also requested damages and attorney's fees for the alleged deprivation of their constitutional rights. We believe the district court's dismissal of all claims can properly be read as an implied determination that there exists no further genuine issue as to appellants' right to recover damages and fees. It must be remembered that the trial judge here had the benefit of a full evidentiary hearing concerning the events at the Consulate on the date in question. Both sides presented witnesses, and the facts in issue were fully developed by the parties. Moreover, since the summary judgment motions of both the federal and municipal defendants alternatively asked for dismissal under Rule 12(b), the court below could properly have considered the hearing testimony as "matters outside the pleading," Rule 12(b), thereby converting the dismissal requests into summary judgment motions under Rule 56.

Given our holding today, the trial judge's familiarity with the facts of the case, and his already expressed determination that the remainder of appellants' claims are meritless, we see no reason to remand only so that, after appropriate motions, the district court may once again enter the same order, which would return to this court on another appeal. Federal procedure is not so inflexible as to require us to create a legal boomerang out of a question which has already been resolved.

AFFIRMED.