**UNITED STATES of America, Appellee,**

v.

**Bruce Roy LEE, Appellant.**

**No. 90–5264.**

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 15, 1990.

Decided June 10, 1991.

Rehearing and Rehearing En Banc
Granted as to Count I; Opinion
and Judgment Vacated as to Count I
Aug. 14, 1991.

John W. Lundquist, Minneapolis, Minn., for appellant.

Robert A. Brunig, Minneapolis, Minn., for amicus curiae Minnesota Civil Liberties Union.

Linda F. Thome, Washington, D.C., for appellee.

Before ARNOLD and MAGILL, Circuit Judges and BENSON,* Senior District Judge.

BENSON, Senior District Judge.

Bruce Roy Lee constructed and burned a cross adjacent to an apartment complex in which a number of black families resided. He was charged with conspiracy against civil rights in violation of 18 U.S.C. § 241 (count I), interference with housing rights by means of force or threat of force in violation of 42 U.S.C. § 3631(a) (count II), and the use of fire in the commission of a felony in violation of 18 U.S.C. § 844(h)(1) (count III). Upon a jury verdict,[1] Lee was convicted on counts I and III and acquitted on count II.[2] He appeals his convictions.

On appeal, Lee challenges the validity of 18 U.S.C. § 241 on first amendment grounds. He also challenges the trial court's instructions, the sufficiency of the evidence, the prosecutor's closing argument, and the applicability of 18 U.S.C. § 844(h)(1). We affirm as to Count I and reverse as to Count III.

---

* The Honorable Paul Benson, Senior United States District Judge for the District of North Dakota, sitting by designation.

1. The Honorable Donald D. Alsop, Chief Judge for the District of Minnesota, presiding.

2. Lee was sentenced to imprisonment for twenty-one months on count I and to a mandatory, consecutive term of five years on count III. He was placed on supervised release for three years to follow imprisonment and ordered to pay a special assessment of $100.

## FACTS

On August 11, 1989, Bruce Roy Lee was visiting his girlfriend, Debbie Dockter, in Coon Rapids, Minnesota. Dockter resided at the Tamarack Apartments, a three building complex in which approximately fifteen black families lived. The racial mix of the Tamarack Apartments' residents was approximately three quarters white and one quarter black.

On the morning of August 11, Lee joined Dockter and several other tenants, including Werner Jahr and his wife Cathy Jahr, at a picnic table outside the apartments. The group drank alcohol and discussed racial problems which had been occurring among children in the complex. Several assaults had occurred. The group also discussed the likelihood that the Joneses, a black family who lived in an apartment above Dockter, would be evicted. It was rumored that Pearl Jones' son had assaulted a white child.

The drinking and discussion continued throughout the day. At approximately three o'clock, Werner Jahr mentioned that he had read an article about the Ku Klux Klan. He told Lee that if the Klan were there, there would be a cross burning. Jahr suggested they burn a cross and Lee agreed that it was a good idea. Lee then constructed a wooden cross. Later that afternoon, Lee told Dockter's sister that he intended to burn the cross because there were problems with the people upstairs and he was going to do something about it.

At approximately ten o'clock, Lee changed into dark clothes. There was testimony that Lee also donned a white mask. Lee then burned the cross on a small hill about 386 feet from the apartment buildings. Although the cross had been soaked with mineral spirits, it burned only briefly. Witnesses testified that Lee seemed disappointed that the cross had not burned longer.

The burning cross was seen by Pearl Jones and her family and friends from the Joneses' balcony. Pearl Jones testified that she was afraid when she saw it because it made her think of the Ku Klux Klan—"peoples that hate blacks." Tr. at 189. Upon seeing the cross, she said "I hope they don't come up here and burn us up." Tr. at 191. She felt the cross burning was directed at her.

Lee later stated to another tenant that he had taken part in the cross burning and that he knew cross burning was a symbol of the Klan. He also said he had burned the cross to take a stand and that "[m]aybe that would get rid of some of the bad blacks that were there, they would take the message seriously and leave." Tr. at 288.

## DISCUSSION

### *The First Amendment*

■ Title 18, section 241 of the United States Code provides in part that it is a crime to "conspire to injure, oppress, threaten, or intimidate any inhabitant of any State, Territory, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same...." Lee contends that this statute, as applied to him, violates the first amendment because it punishes the expressive act of cross burning. Lee also contends the statute is overbroad and vague.

We proceed on a predicate that cross burning is conduct which possesses sufficient elements of communication to implicate the first amendment. However, it does not necessarily follow that the burning of this cross was protected first amendment activity. *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968). The relevant inquiry is whether the governmental interest in regulation is related to the suppression of free expression. *Texas v. Johnson*, 491 U.S. 397, 403, 109 S.Ct. 2533, 2538, 105 L.Ed.2d 342 (1989). If the interest is related to the suppression of expression, we must apply a heightened standard of review. *Id.* If the interest is unrelated to the suppression of expression, the more deferential *O'Brien* standard will apply. *Id.*

We hold that the governmental interest supporting this regulation is unrelated to the suppression of free expression. Sec-

tion 241 does not prohibit conspiracies to communicate offensive or racist messages; it does not prohibit conspiracies to simply burn a cross. Section 241 is a content neutral statute which prohibits conspiracies to threaten or intimidate others in the exercise or enjoyment of their federally guaranteed rights. As applied to the facts before us, section 241 does not prohibit Lee from conspiring to burn a cross to convey an offensive message or a message of racial hatred. Rather, the statute prohibits Lee from conspiring to burn a cross to threaten or intimidate targeted individuals in the exercise of their federally guaranteed right to rent and occupy a dwelling. *See CISPES (Committee in Solidarity with the People of El Salvador) v. Federal Bureau of Investigation*, 770 F.2d 468, 474 (5th Cir.1985).[3]

Having concluded that the governmental interest in protecting the free exercise of federally guaranteed rights is unrelated to the suppression of free expression, we next determine whether the statute 1) is within the constitutional power of the government; 2) furthers an important or substantial governmental interest; and 3) has no greater restriction on first amendment freedom than is essential to further the underlying interest. *O'Brien*, 391 U.S. at 377, 88 S.Ct. at 1679.

Section 241 is intended to protect the free exercise of all rights and privileges secured by the Constitution and by all laws of the United States. *United States v. Price*, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). To the extent that the enactment of section 241 is an exercise of the power of Congress to enforce the thirteenth amendment by and through legislation, we hold that it is valid. *See* U.S. Const. amend. XIII, § 2; *cf. Williams v. Matthews Co.*, 499 F.2d 819, 825 (8th Cir. 1974) (Fair Housing Act of 1968 is also an exercise of Congress' power under the thirteenth amendment).

We further hold that the enactment of section 241 furthers an important and substantial governmental interest in protecting federally guaranteed rights—specifically, the right to be free from racial discrimination in housing.

Finally, we hold that the incidental restriction on first amendment freedom is no greater than that which is essential to further the governmental interest. Section 241 is a narrowly tailored law which targets and eliminates the exact source of "evil" it seeks to remedy by requiring a strict scienter requirement. *Cf. Boos v. Barry*, 485 U.S. 312, 326, 108 S.Ct. 1157, 1166, 99 L.Ed.2d 333 (1988) (18 U.S.C. § 112 "does not prohibit picketing; it only prohibits activity undertaken to 'intimidate, coerce, threaten, or harass.' "). The statute is violated *only* if it is proved beyond a reasonable doubt that the defendant possessed the specific intent to threaten or intimidate another in the exercise or enjoyment of a federally guaranteed right. *See United States v. Guest*, 383 U.S. 745, 753–54, 86 S.Ct. 1170, 1175–76, 16 L.Ed.2d 239 (1966). In *Guest*, the Supreme Court held that § 241 requires the offender act with a specific intent to interfere with a federal right. *Id.* If the specific intent is absent, the statute does not restrict first amendment freedom.

Lee contends the statute is overbroad. We disagree. Section 241, which prohibits threats or intimidation which abridge the free exercise or enjoyment of federally guaranteed rights, does not reach a substantial amount of constitutionally protected conduct. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982).

 Intimidation by threats of physical violence is not protected by the first

---

**3.** In *CISPES*, the Fifth Circuit reviewed 18 U.S.C. § 112(b)(1)–(2), which makes it a crime to "intimidate, coerce, threaten or harass" a foreign official in the performance of his duties. The court concluded that § 112(b)(1)–(2) does not restrict any particular message, but rather proscribes conduct of a threatening or intimi-

dating nature. *See also Boos v. Barry*, 485 U.S. 312, 326, 108 S.Ct. 1157, 1166, 99 L.Ed.2d 333 (1988) ("[Section] 112 is not narrowly directed at the content of speech but at any activity, including speech, that has the prohibited effects.").

amendment. *See, e.g., Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (true threats are not constitutionally protected speech); *United States v. Orozco–Santillan,* 903 F.2d 1262, 1265 (9th Cir.1990) ("A 'true' threat, where a reasonable person would foresee that the listener will believe he will be subjected to physical violence upon his person, is unprotected by the first amendment."); *United States v. Mitchell,* 463 F.2d 187, 191 (8th Cir.1972) (violent threats are devoid of constitutional protection), *cert. denied,* 410 U.S. 969, 93 S.Ct. 1449, 35 L.Ed.2d 705 (1973). However, physical violence does not mark the constitutional line beyond which Congress may not legislate. Although persons must generally tolerate highly offensive and disturbing speech, the government may restrict such speech where it intrudes on the privacy of the home or where the degree of captivity makes it impractical for an unwilling listener or viewer to avoid exposure to the speech. *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 209–11, 95 S.Ct. 2268, 2272–73, 45 L.Ed.2d 125 (1975).

We find that the interest in residential privacy is clearly implicated in this legislation as applied to protect the right to be free from racial discrimination in housing. *Cf. Frisby v. Schultz,* 487 U.S. 474, 484–85, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988) ("There simply is no right to force speech into the home of an unwilling listener.").[4] Furthermore, one who targets an individual with the intent to so threaten or intimidate that individual as to interfere with his or her free exercise of the right to occupy a dwelling may place the targeted individual in such a state of captivity that it in effect takes away the individual's ability to avoid exposure to the speech.

The jury, of course, was aware of the circumstances of Lee's conduct. The jury could readily have found that Lee's conduct was tantamount to intimidation by threat of physical violence. It was not mere advocacy, but rather an overt act of intimidation which, because of its historical context, is often considered a precursor to or a promise of violence against black people.[5] Upon the record evidence, the jury could have found that the cross burning was an especially intrusive act which invaded the substantial privacy interests of its victims in an essentially intolerable manner. To protect the inhabitants of this nation from such an attack on civil rights does not violate the spirit of the first amendment.

Lee also challenges the statute as unconstitutionally vague. He contends the statute is vague because it fails to give notice that burning a cross is a crime. This contention is without merit. The statute does not prohibit the burning of a cross; the statute prohibits conspiracies where the requisite specific intent is demonstrated. "[W]here the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law." *Screws v. United States,* 325 U.S. 91, 102, 65 S.Ct. 1031, 1036, 89 L.Ed. 1495 (1945); *see also Price,* 383 U.S. at 806 n. 20, 86 S.Ct. at 1163 n. 20.

Lee also contends the statute is vague because the term "intimidate" has a "pure-

---

4. "'The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society.' Our prior decisions have often remarked on the unique nature of the home, 'the last citadel of the tired, the weary, and the sick,' and have recognized that '[p]reserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value.'" *Frisby v. Schultz,* 487 U.S. 474, 484, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988) (citations omitted) (upholding ordinance banning picketing targeted at a single dwelling in a residential area).

5. Lonetta Miller, a seventy-one year old black woman testified on cross-examination as follows:

Q: Could you tell the ladies and gentlemen of the jury what a cross burning means, whether it is in the south or anywhere else?

A: Well it is a form of intimidation; the ku klux klan uses it for threats; promises of violence, and that sort of thing.

From what I understand a lot of the cross burnings in the south during the civil rights movement preceded hangings and that sort of thing. Of course, being a black, that is what it calls to mind.

Tr. at 354.

ly subjective" meaning. We reject this contention. In evaluating the alleged vagueness of the term "intimidate," we do not consider its meaning in isolation. Instead, we consider its meaning in the context of the statute. *American Communications Ass'n v. Douds*, 339 U.S. 382, 412, 70 S.Ct. 674, 691, 94 L.Ed. 925 (1950). Viewed in the context of the statute and, thus, as part of the complex scienter requirement, the meaning of the term is not vague. To intimidate is to engage in conduct designed to interfere with a person's free exercise of federally guaranteed rights. In the context of the statute, the term "intimidate" neither requires ordinary people to guess at its meaning nor does it encourage arbitrary or discriminatory enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983).

*Propriety of the Jury Instruction regarding Intent*

■ The court instructed that

The words "threaten" or "intimidate" are not used in any technical sense, but may cover a variety of conduct intended to harm, frighten, punish or inhibit the free action of other persons. To "threaten" or "intimidate" does not require a threat of physical force or the intimidation of physical fear.

Lee contends the trial court erred by instructing the jury that the term "intimidate" does not require fear of physical force. In light of the facts of this case and in view of our discussion of the first amendment challenge, this was a "negative" instruction that was unnecessary but harmless.

Lee also contends the trial court's instruction was erroneous because he argues it suggests that the term "intimidate" includes conduct "which merely would inhibit the free action of others in some respect." Appellant's Brief at 29. We conclude that this argument mischaracterizes the court's instruction. The instruction, when construed in the context of the instructions in their entirety, was not erroneous.

*Sufficiency of the Evidence*

■ Lee contends that the evidence shows that he did "nothing other than construct and burn a cross for a minute or less in a field some 386 feet away from an apartment complex in which both whites and blacks resided." We disagree. The facts as recited above provide sufficient evidence from which a rational trier of fact could have concluded that the essential elements of the crime charged under 18 U.S.C. § 241 were proved beyond a reasonable doubt.

*Propriety of the Jury Instruction regarding the Applicability of the Fair Housing Act of 1968*

■ Lee also contends that the trial court erred by instructing the jury that the Fair Housing Act of 1968 was implicated. The court instructed that it was an essential element of the crime charged that

the right allegedly interfered with was a right protected by the laws or Constitution of the United States. In connection with this element, the Fair Housing Act of 1968 protects the right of any person to hold and occupy a dwelling without intimidation or interference because of race or color.

Lee essentially contends that the instruction is erroneous because the Fair Housing Act confers only the limited right to hold and occupy a dwelling free from discrimination by landlords and their agents; he suggests the Act does not confer a right to be free from discrimination by persons such as himself. Lee misreads the Act and the indictment. *See* 42 U.S.C. §§ 3602(f), 3604, 3617. His objection is without merit.

*Prosecutor's Closing Argument*

■ Lee contends the prosecutor's remarks that evidence was "uncontradicted" were improper comment on the defendant's decision not to testify. References to "uncontradicted" evidence are impermissible if they are intended to draw attention to the defendant's failure to testify, or if the jury would naturally or necessarily understand them as comment on the defendant's failure to testify. *United States v. Kragness*, 830 F.2d 842, 868 (8th Cir.1987).

■ There is nothing in the record that would suggest the prosecution intended to direct the jury's attention to the fact that defendant chose not to testify. Nor do we find that the jury would "naturally or necessarily" understand the prosecutor's references as comment on the defendant's failure to testify. We conclude that in view of the court's "curative" instruction, which was patterned after that given in *Kragness*,[6] the prosecutor's remarks did not prejudice the substantial rights of the defendant.

### Applicability of 18 U.S.C. § 844(h)(1)

■ Lee contends his conviction on count III must be reversed because he did not use fire to commit a felony within the meaning of 18 U.S.C. § 844(h)(1). We agree and reverse the conviction on count III.

Prior to the enactment of the Anti–Arson Act of 1982, section 844(h)(1) provided that it was a crime to "use[ ] an explosive to commit any felony which may be prosecuted in a court of the United States...." Section 844(h)(1), in its present form, now provides that it is a crime to "use[ ] *fire or* an explosive to commit any felony which may be prosecuted in a court of the United States...." (emphasis added). The legislative history indicates that § 844(h)(1) was amended to include use of "fire" in order to facilitate the prosecution of arson. H.R. Rep. No. 678, 97th Cong., 2d Sess. 1–2, *reprinted in* 1982 U.S.Code Cong. & Admin.News 2631–32. The amendment was intended to remove the obstacle of proving the prior requirement that the damage caused by arson was caused by means of an "explosive."[7] *Id.* There is no indica-

tion that the amended statute was intended to apply to facts such as those before us. Lee did not commit arson, nor did he damage persons or property by the use of fire.[8] Because we are left to guess as to whether Congress intended § 844(h)(1) to apply to facts such as these, we must reverse. *See Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980) (rule of lenity in construing criminal statutes).

The judgment of the district court is affirmed on Count I and reversed on Count III.

ARNOLD, Circuit Judge, dissenting.

I would reverse the conviction on count I, which is laid under 18 U.S.C. § 241. This disposition would make it unnecessary to discuss count III, involving the use of fire in any conduct which is a felony under federal law.

As to count I, I take it as a given, and the Court's opinion does not seem to disagree, that the act of cross burning, as it occurred in this case, was expressive conduct. It was intended to convey a message, an idea: "We do not like black people, and we want them to move out," or something of the sort. This kind of communication, no matter how hateful, is "speech" within the meaning of the First Amendment. It is entitled to protection from governmental sanction just as much as speech of which we might approve.

The Court takes the position that § 241, as applied to expressive conduct, is content neutral. For purposes of analysis in the present case, I will accept this characterization. The statute does prohibit threats and intimidation of all kinds, regardless of

---

6. The curative instruction was agreed upon by the parties. It provided:

> During the arguments this morning Ms. Sines argued to you that certain evidence was uncontradicted or there was no evidence presented to controvert certain other evidence. I want to remind you in that regard, that it is the law that a defendant in a criminal case has no burden of calling any witnesses or producing any evidence. On the other hand, as I have told you before and will tell you again the government has the burden of proving beyond a reasonable doubt each of the elements of the various offenses.
> Tr. at 508.

7. 128 Cong.Rec. S11,985 (daily ed. Sept. 22, 1982) (statement of Senator Glenn) ("This legislation would enhance the effectiveness of Federal investigations and prosecutions of arson by eliminating the necessity of proving that substances, such as gasoline, were in an 'explosive state' at the time an arson was committed.... Under current law, satisfying this element of proof is quite often an onerous task requiring considerable investigative time and effort...."), *quoted in United States v. Fiore*, 821 F.2d 127, 131 (2nd Cir.1987).

8. Although fire trucks were called, it appears the fire did not threaten damage.

the particular viewpoint of the speaker or actor. Section 241, on its face, is not directed to cross burning as such or any other particular form of conduct, but rather to conspiracies of all kinds to threaten or intimidate others in the exercise of a federal right. Moreover, the black residents of the housing in question had a federal right to live there, and there is evidence in this record sufficient to support a finding that burning of a cross in full view of this apartment complex was intended to, and did in fact, cause at least some of the black residents to be afraid. Still, something is lacking, in my opinion, to justify the application of the statute, as against a First Amendment challenge, on this record.

One of the requirements of the test set out in United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968), is that the statute be narrowly tailored to advance the governmental interest in question, that "the incidental restriction on alleged First Amendment freedoms [be] no greater than is essential to the furtherance of that interest." This statute, though, is not narrowly tailored, as I understand that requirement.

First, it is necessary to define the governmental interest involved, and to do so in a way that does not itself transgress the First Amendment. I would define the interest as follows: the right to be free of physical force, or threats of physical force. Section 241, of course, says nothing about force. It speaks only of intimidation, and, as defined in the jury instructions given by the District Court here, this concept covers "a variety of conduct intended to harm, frighten, punish, or inhibit the free action of other persons. To 'threaten' or 'intimidate' does not require a threat of physical force or the intimidation of physical fear." Such a definition, I think, is much too broad, because it would criminalize a great deal of conduct, some of it pure speech, which does no more than forcefully state a view that others find revolting or appalling. To uphold the statute as construed in this way is wholly inconsistent with First Amendment values we have long cherished. Those values include speech which "is of-

ten vituperative [and] abusive," Watts v. United States, 394 U.S. 705, 708, 89 S.Ct. 1399, 1402, 22 L.Ed.2d 664 (1969).

Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), is an excellent example. There, the conviction of a member of the Ku Klux Klan under a criminal syndicalism statute was reversed. The defendant had participated in a Ku Klux Klan rally involving a number of hooded figures, some of whom carried weapons. A cross was burned, and threats to "bury" black people were discussed. The message was disseminated on television. A similar case, though involving the other end of the political spectrum, is NAACP v. Claiborne Hardware Co., 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), which involved a boycott of merchants accompanied by a threatening statement specifically advocating physical violence. See also Collin v. Smith, 578 F.2d 1197 (7th Cir.), cert. denied, 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978) (Nazi Party march through a heavily Jewish city held protected by the First Amendment). The law seems to be this: even speech that advocates violence is protected by the First Amendment, unless the likelihood of actual violence crosses some constitutionally derived line.

Here, as I have noted, the District Court explicitly told the jury, over defendant's objection, that neither force nor the threat of force was required, and that they could convict if they found defendant's actions so much as "inhibit[ed] the free action of other persons." I suggest that a great deal of speech is sufficiently forceful or offensive to inhibit the free action of persons against whom it is directed, in the sense that it would make someone hesitate before acting in a certain way. Indeed, that is the very purpose of the speech: to influence others' conduct. In the present case, the point is neatly made by the fact that the jury acquitted defendant of count II, interference with housing rights in violation of 42 U.S.C. § 3631(a), an offense that contains as one of its elements force or the threat of force. It seems highly likely, though we of course cannot be certain, that the jury did not think the present record indicated ei-

ther imminent actual force or the threat of force. It thought, instead, that intimidation of some lesser form had taken place.

If, instead of burning a cross, an act especially odious because of its historical antecedents, the defendant had distributed leaflets in the Tamarack Apartments, stating that the Ku Klux Klan was in the neighborhood, disliked black people, and wanted them to move out, the black residents of the apartments could well have been threatened or intimidated in the sense allowed by the District Court's instructions to the jury in this case. Yet, the same "captive audience" theory advanced by the Court here, *ante* at 956, would apply to such a case. If the cross had been burned on the apartment complex's own property, the Court would be closer to *Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (upholding ordinance banning picketing targeted at a single dwelling in a residential area), but the cross was nearly 400 feet away and on someone else's land. Whatever the limits of the "captive audience" principle may be, I would not extend it this far.

For these reasons, I respectfully dissent. The result would not be dismissal of the indictment, but only a new trial, at which the jury would be instructed that it could not convict on count I unless it found that the threats and intimidation involved an imminent use of force, or at least caused the residents of Tamarack Apartments to fear that force was imminent.

### Order

#### Aug. 14, 1991

Appellant's petition for rehearing with suggestion for rehearing en banc has been considered by the court and is granted as to Count I only. The opinion and judgment of this court filed June 10, 1991, are hereby vacated as it pertains to Count I. The parties may file supplemental briefs not to exceed fifteen pages within two weeks from the date of this order. The clerk will notify the parties of the time and place of oral argument at a later date.