UNITED STATES of America,
Plaintiff–Appellee,

v.

Bruce Roy LEE, Defendant–Appellant.

No. 90–5264.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 15, 1992.

Decided Oct. 7, 1993.

John W. Lundquist, Minneapolis, MN, argued, for appellant.

David K. Flynn, Dept. of Justice, Washington, DC, argued (Linda F. Thome, Dept. of Justice, on the brief), for appellee.

Before RICHARD S. ARNOLD, Chief Judge, LAY, Senior Circuit Judge, McMILLIAN, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL, BEAM, LOKEN, HANSEN, MORRIS SHEPPARD ARNOLD, Circuit Judges.

PER CURIAM.

We reverse the conviction for conspiracy under 18 U.S.C. § 241 (1988), because of errors in the instructions that were given. We remand for retrial under instructions to be given in accordance with the concurring opinion of Judge John R. Gibson, in which Chief Judge Arnold and Judges Bowman, Wollman, and Hansen concur. Judges Lay, Loken, and Morris S. Arnold concur in the result and judgment of the court for the reasons explained in Judge Lay's concurring and dissenting opinion.

JOHN R. GIBSON, Circuit Judge, concurring, with whom Chief Judge RICHARD S. ARNOLD, Judges BOWMAN, WOLLMAN, and HANSEN, concur.

Bruce Roy Lee was convicted of conspiracy against civil rights in violation of 18 U.S.C. § 241 (1988), after he constructed and burned a cross on a hill near an apartment complex in which a number of black families resided. A panel of this court rejected Lee's argument that the First Amendment was a bar to conviction under section 241, and affirmed his conviction on that count. *United States v. Lee,* 935 F.2d 952 (8th Cir.1991). We granted rehearing en banc, and now reverse Lee's conviction for conspiring under 18 U.S.C. § 241.

Since our panel heard this case, the United States Supreme Court has decided two First Amendment cases involving hate-crime statutes. In *R.A.V. v. City of St. Paul, Minnesota,* —— U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), the Supreme Court re-

versed a conviction for burning a cross on a black family's lawn in violation of the St. Paul Bias Motivated Crime Ordinance. The Supreme Court held that cross burning was non-verbal expressive activity protected by the First Amendment, and that the St. Paul Ordinance specifically barring the cross burning was facially unconstitutional. *Id.* at ——, 112 S.Ct. at 2547. In *Wisconsin v. Mitchell*, —— U.S. ——, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993), the Court held that a defendant's First Amendment rights were not violated by the application of a sentencing enhancement statute for crimes in which the defendant intentionally selects his victim based on "race, religion, color, disability, sexual orientation, national origin or ancestry of that person...." *Id.* at —— n. 1, 113 S.Ct. at 2197 & n. 1.

We first state the facts essentially as they appear in the panel's opinion. *Lee,* 935 F.2d at 954. On August 11, 1989, Bruce Roy Lee was visiting his girlfriend, Debbie Dockter, in Coon Rapids, Minnesota. Dockter lived at the Tamarack Apartments, a three building complex in which approximately fifteen black families lived. The racial mix of the Tamarack Apartments' residents was approximately three quarters white and one quarter black.

On the morning of August 11, Lee joined Dockter and several other tenants, including Werner Jahr and his wife Cathy Jahr, at a picnic table outside the apartments. The group drank alcohol and discussed racial problems, including several assaults which had occurred among children in the complex. The group also discussed the likelihood that the Joneses, a black family living in an apartment above Dockter, would be evicted. It was rumored that Pearl Jones' son had assaulted a white child.

The drinking and discussion continued throughout the day. At approximately three o'clock, Werner Jahr mentioned that he had read an article about the Ku Klux Klan. He told Lee that if the Klan was there, there would be a cross burning. Jahr suggested they burn a cross and Lee agreed that it was a good idea. Lee then constructed a wooden cross. Later that afternoon, Lee told Dockter's sister that he intended to burn the cross because there were problems with the people

upstairs and he was going to do something about it.

At approximately ten o'clock, Lee changed into dark clothes. There was testimony that Lee also donned a white mask. Lee then burned the cross on a small hill about 386 feet from the apartment buildings. Although the cross had been soaked with mineral spirits, it burned only briefly. Witnesses testified that Lee seemed disappointed that the cross had not burned longer.

Pearl Jones, her family, and her friends saw the burning cross from their balcony. Pearl Jones testified that she was afraid when she saw it because it made her think of the Ku Klux Klan—"peoples that hate blacks." Upon seeing the cross, she said, "I hope they don't come up here and burn us up." She felt the cross burning was directed at her.

Lee later admitted to another tenant that he had taken part in the cross burning and that he knew cross burning was a Klan symbol. He also said he had burned the cross to take a stand and that "[m]aybe that would get rid of some of the bad blacks that were there, they would take the message seriously and leave."

Lee was charged with violating 18 U.S.C. § 241, which reads:

> If two or more persons conspire to injure, oppress, threaten, or intimidate any inhabitant of any State, Territory, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same....

The court instructed the jury on the nature of the charge and described the elements of the offense:

> ... on August 11 two or more persons, including Bruce Lee, had an agreement or an understanding to threaten or intimidate one or more persons in the exercise of rights secured by the [C]onstitution or laws of the United States. This element of the offense, the agreement or the conspiracy, requires that the plan of the conspirators be to threaten or intimidate one or more inhabitants of the United States....

[T]he words threaten or intimidate, are not used in any technical sense, but they cover a variety of conduct intended to harm, frighten, punish, or inhibit the free action of other persons.

To threaten or intimidate does not require a threat of physical force or the intimidation of physical fear.

.    .    .    .    .

In order to constitute a criminal conspiracy under Count I, the defendant's actions must have been taken with the specific intent to intimidate or interfere with the residents right to occupy a dwelling free of force or threats of force.

... [Y]ou are advised that for this element of the offense you must find the defendant, if and when he formed or joined the conspiracy, did so with the intent that the victims be deprived of their rights to hold and occupy the apartments at the Tamarack address, free from threats or intimidation on account of race.

... It is only necessary that the alleged conspirators had a purpose to threaten or intimidate others in the exercise of this right to occupy and lease property.

The jury acquitted Lee on Count II of the indictment which charged him with interfering with housing rights by means of force or threat of force in violation of 42 U.S.C. § 3631(a) (1988). The jury convicted Lee on Count III of the indictment which charged him with the use of fire in the commission of a felony in violation of 18 U.S.C. § 844(h)(1) (1988). The panel opinion reversed this conviction, reasoning that it was unclear whether Congress intended the statute to apply to Lee's conduct. 935 F.2d at 958. The government requested rehearing en banc with respect to the panel's reversal of the section 844(h)(1) conviction; we granted rehearing en·banc only with respect to the section 241 conviction, and the panel opinion is the final disposition of the section 844(h)(1) issue. The jury convicted Lee of violating section 241 (Count I), and the sole issue before us is whether section 241, as applied, violates the First Amendment by punishing the expressive act of cross burning.

A fitting introduction to our discussion is Justice Scalia's statement in *R.A.V.:* "Let there be no mistake about our belief that burning a cross in someone's front yard is reprehensible." —— U.S. at ——, 112 S.Ct. at 2550. *R.A.V.* supplies the predicate for our analysis; namely, that cross burning is symbolic expression protected by the First Amendment. —— U.S. at ——, 112 S.Ct. at 2547. *R.A.V.,* however, does not aid our analysis beyond a number of general principles, as it deals with an ordinance that specifically proscribes cross burning.

Similarly, the Supreme Court's recent decision in *Wisconsin v. Mitchell* does not change our analysis. In that case, the state court applied a state penalty enhancement statute because the defendant intentionally selected his victim based on race. —— U.S. at ——, 113 S.Ct. at 2197. The Supreme Court first rejected the argument that the enhancement statute violated the First Amendment because it punished offensive thought. *Id.* at ——-——, 113 S.Ct. at 2198–2200. The Court reasoned that the statute, unlike the statute in *R.A.V.,* was aimed at conduct (physical assault) unprotected by the First Amendment, and that motive has long been a proper sentencing consideration. *Id.* at ——, 113 S.Ct. at 2201. The Court also stated that the state's isolation of "bias-inspired" conduct for penalty enhancement was based on the perceived social harms of this conduct and was "over and above mere disagreement with [the] offenders' beliefs or biases." *Id.* The Court also rejected the defendant's overbreadth argument, holding that the alleged "chilling effect" of the statute was too attenuated and speculative. *Id.*

"Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Regan v. Time, Inc.,* 468 U.S. 641, 648–49, 104 S.Ct. 3262, 3266–67, 82 L.Ed.2d 487 (1984). When a law is content-based, we must subject the state's interest "to 'the most exacting scrutiny.'" *Texas v. Johnson,* 491 U.S. 397, 411, 109 S.Ct. 2533, 2543, 105 L.Ed.2d 342 (1989) (quoting *Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 1164, 99 L.Ed.2d 333 (1988)). "'A law *directed at* the communicative na-

ture of conduct must, like a law directed at speech itself, be justified by the substantial showing of need.'" *Johnson*, 491 U.S. at 406, 109 S.Ct. at 2540 (quoting *Community for Creative Non–Violence v. Watt*, 703 F.2d 586, 622–23 (D.C.Cir.1983) (en banc) (Scalia, J., dissenting), *rev'd sub nom. Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)).

The government argues that Lee's prosecution was content neutral, and that there were both protected and unprotected elements to Lee's conduct. The government contends that Lee was not convicted based on the protected expression of his racist views as symbolized by the burning cross, but because the jury found that he acted with the specific intent to threaten and intimidate black residents of the apartment building in the exercise of their federally-guaranteed housing rights. The government states that because Lee's prosecution was not related to the suppression of expression, we must apply the more deferential standard set forth in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), as reaffirmed in *Barnes v. Glen Theatre, Inc.*, —— U.S. ——, ——, 111 S.Ct. 2456, 2461, 115 L.Ed.2d 504 (1991) (plurality opinion); *id.* at ——, 111 S.Ct. at 2468 (Souter, J., concurring in judgment). Under *O'Brien*, incidental limitations on First Amendment freedoms are permitted if: the governmental regulation is within the constitutional power of the government; it furthers an important or substantial governmental interest; the governmental interest is unrelated to the suppression of free expression; and the restriction is no greater than is essential to the furtherance of that interest. *Id.*, 391 U.S. at 376–77, 88 S.Ct. at 1678–79.

Whether application of section 241 violated Lee's First Amendment rights depends on the likely communicative impact of Lee's conduct. The Supreme Court has rejected the argument that a law is content neutral when the "'emotive impact of speech on its audience is not a "secondary effect"'" unrelated to the content of the expression itself." *Johnson*, 491 U.S. at 411, 109 S.Ct. at 2543 (quoting *Boos*, 485 U.S. at 321, 108 S.Ct. at 1164). For example, in *Boos*, a plurality of the

Court held that the need to protect the dignity of foreign diplomatic personnel by shielding them from speech critical to their government could not justify an ordinance prohibiting the display of any sign within 500 feet of a foreign embassy if the sign tended to bring the foreign government into "public odium" or "public disagreement." 485 U.S. at 315, 321, 108 S.Ct. at 1160, 1164 (plurality opinion); *see also id.* at 334, 108 S.Ct. at 1171 (Brennan, J., concurring in part and concurring in judgment). The Court held that the law was not content neutral because the law focused on the content of the speech and the direct impact it had on its listeners. *Id.* at 320–21, 334–35, 108 S.Ct. at 1163–64, 1170–71. The Court later endorsed the *Boos* plurality in *Johnson*, 491 U.S. at 411, 109 S.Ct. at 2543, and struck down a conviction arising from a flag burning. *Id.* at 420, 109 S.Ct. at 2548. The demonstrator was convicted under a statute that prohibited the desecration of a national flag. *Id.* at 400 n. 1, 109 S.Ct. at 2537 n. 1. The Court concluded that the statute, as applied, was content based because whether the burning of the flag violated the law depended on the "likely communicative impact" of the expressive conduct. *Id.* at 411, 109 S.Ct. at 2543.

Although section 241 is content neutral on its face, its application to Lee turns on the instructions given to the jury. *See, e.g., Brandenburg v. Ohio*, 395 U.S. 444, 448–49, 89 S.Ct. 1827, 1830–31, 23 L.Ed.2d 430 (1969) (considering jury instructions in as an applied challenge to statute). The court instructed that the defendant's actions must be taken with the "specific intent to intimidate or interfere" with the residents' rights to hold and occupy an apartment free from threats or intimidation on account of race. The court also defined "threaten" and "intimidate" to include "a variety of conduct intended to harm, frighten, punish, or inhibit the free action of other persons," but not requiring "a threat of physical force or the intimidation of physical fear." Most evidently, threatening and intimidating one or more persons and conduct intended to harm, frighten, punish, or inhibit the free action of other persons relates to the communicative impact and emotive impact of speech on its audience. Thus, under *Texas v. Johnson* and

*Boos v. Barry,* we cannot conclude that Lee's conviction is unrelated to the suppression of expression. The statute as written is broad, but as targeted toward Lee, it relies on the subjective reactions of residents who witnessed the cross burning and upon the perception of the viewer as an inherent aspect of the prosecution. The jury instructions outlining the scope of section 241 extend substantially beyond the plain unvarnished wording of the statute. As Chief Judge Arnold stated in his dissent to the panel opinion in this case, the definition contained in the instructions "is much too broad, because it would criminalize a great deal of conduct, some of it pure speech, which does no more than forcefully state a view that others find revolting or appalling." 935 F.2d at 959.

Certainly, when " ' "speech" and "non-speech" elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the non-speech element can justify incidental limitations on First Amendment freedoms.' " *Johnson,* 491 U.S. at 406, 109 S.Ct. at 2540 (quoting *O'Brien,* 391 U.S. at 376, 88 S.Ct. at 1678). In *O'Brien,* the defendant burned his draft card and was convicted under a statute prohibiting the knowing destruction of a selective service registration certificate. 391 U.S. at 375, 88 S.Ct. at 1678. The Court upheld the conviction reasoning that the continuing availability of the cards served a legitimate and substantial purpose in the administration of the selective service system. *Id.* at 379, 382, 88 S.Ct. at 1680, 1682. The Court concluded that O'Brien's deliberate destruction of his card frustrated this purpose and that it was "for this non-communicative aspect of his conduct" for which he was convicted. *Id.* at 382, 88 S.Ct. at 1682. The Supreme Court has pointed out, however, that the relatively lenient standard announced in *O'Brien* is limited to those cases in which the government interest is unrelated to the suppression of free expression, like those in time, place, and manner restrictions. *Johnson,* 491 U.S. at 406, 109 S.Ct. at 2540; *see also R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2544.

Like the statute in *O'Brien,* section 241 is neutral on its face. As applied, however,

section 241 focuses on the conduct's communicative and emotive impact. This impact is not a secondary effect unrelated to the content of the expression itself. *Johnson,* 491 U.S. at 411, 109 S.Ct. at 2543; *Boos,* 485 U.S. at 321, 108 S.Ct. at 1164. Although there is an important governmental interest in protecting the exercise of the black residents' right to occupy a dwelling free from intimidation, we cannot say that, under the circumstances before us, the governmental interest is unrelated to the suppression of free expression. *Cf. O'Brien,* 391 U.S. at 302, 88 S.Ct. at 1599. No matter how abhorrent, the burning of the cross is expression, and the governmental interest as applied in this case is not unconnected to that expression. Accordingly, *O'Brien* has not been satisfied.

We find further support for our conclusion in *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), which, like this situation, involved the application of a general statute to expressive conduct. Cohen was convicted of violating a statute that prohibited disturbing the peace or quiet by offensive conduct when he wore, in the municipal courthouse, a jacket bearing a four-letter "unseemly expletive" in protest of the draft and Vietnam War. *Id.* at 23, 91 S.Ct. at 1787. Although the Supreme Court referred to *O'Brien,* it did not apply the *O'Brien* test. *Id.* at 18, 91 S.Ct. at 1784. Instead, the Court stated that the conviction quite clearly rested on the asserted offensiveness of the words Cohen used, and the only conduct the State sought to punish was the fact of communication. *Id.* Thus, the conviction rested entirely on speech, and not on separately identifiable conduct. *Id.*

The government also argues that Lee's conviction can be upheld under the second exception articulated in *R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2546. This exception allows content-based distinctions among subclasses of expression when the prohibited subclass is "associated with particular 'secondary effects' of the speech," such as treason laws or sexually derogatory comments in the workplace. *Id.* The Court explained that these statutes are directed against conduct, not expression, and that "a particular content-based subcategory of a proscribable

class of speech can be swept up incidentally within the reach of a statute directed at conduct." *Id.*

The government argues that the expression here is "swept up incidentally" within a statute directed at conduct prohibiting discrimination in housing. The government continues in its argument that Lee was prosecuted and convicted not for the expressive content of his conduct, but because of the action it entailed, the intimidation and interference of those exercising their federally-guaranteed housing rights.

This argument is unpersuasive. The exception in *R.A.V.* cites as examples speech that would violate treason laws or constitute sexually derogatory "fighting words" in violation of Title VII's prescription against sexual discrimination in employment practices. *Id.* Cross burning is not analogous to the examples set forth in *R.A.V.*, and cannot be "swept up incidentally" within a statute prohibiting housing discrimination. Similarly, we cannot conclude that the government has not targeted conduct on the basis of its expressive conduct. *See R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2546–47. As applied under the jury instructions of this case, section 241 targeted conduct which, though expressive of a discriminatory idea or philosophy, is nevertheless protected expressive conduct.

We conclude that section 241, as applied in the prosecution against Lee, violated the First Amendment, and Lee's conviction on Count I must be reversed. We also conclude that the indictment need not be dismissed, but that there must be a new trial with the following principles in mind.

The First Amendment cases of the Supreme Court instruct that there are certain categories of speech which are not protected by the First Amendment. For example, the First Amendment does not protect "fighting words" and expression inciting "imminent lawless action." *See R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2545; *Johnson,* 491 U.S. at 409, 109 S.Ct. at 2542. The Supreme Court articulated the imminent lawless action exception in *Brandenburg,* 395 U.S. at 444–49, 89 S.Ct. 1827–31, where a defendant was convicted for actions at a Ku Klux Klan rally, which included the burning of a cross and

threats to "[b]ury" black people. *Id.* at 445–46 n. 1, 89 S.Ct. at 1828–29 n. 1. Part of the rally was televised, but no one attended the rally other than the Klan members and a television reporter. *Id.* The defendant was convicted under a statute that prohibited advocating violence "as a means of accomplishing industrial or political reform" or voluntarily assembling with a group "to teach or advocate the doctrines of criminal syndicalism." *Id.* at 444–45, 89 S.Ct. at 1827–28. The Court reversed the conviction because the indictment and jury instructions defined the offense in terms of mere advocacy not "incitement to imminent lawless action." *Id.* at 448–49, 89 S.Ct. at 1830. The Court refined this exception to exclude First Amendment protection when such "advocacy is directed to inciting or producing imminent lawless action, and is likely to incite or produce such action." *Id.* at 447, 89 S.Ct. at 1829. The Court reiterated that " 'the mere abstract teaching ... of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action.' " *Id.* at 448, 89 S.Ct. at 1830 (quoting *Noto v. United States,* 367 U.S. 290, 297–98, 81 S.Ct. 1517, 1520–21 (1961)).

Thus, under *Brandenburg,* section 241 may be applied to Lee's prosecution as long as it is limited to punishing expression "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.; see also NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 927–29, 102 S.Ct. 3409, 3433–34, 73 L.Ed.2d 1215 (1982) (involving a boycott of merchants accompanied by threatening statements specifically advocating physical violence); *Collin v. Smith,* 578 F.2d 1197, 1204–05 (7th Cir.) (Nazi party march through heavily Jewish city protected by the First Amendment), *cert. denied,* 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978).

Judge Lay's dissent argues that there is insufficient evidence to support Lee's conviction, specifically, that there is no evidence that Lee acted for the purpose of advocating the use of force or violence, or was likely to produce such action. Judge Lay's dissent goes on to argue that even if Lee and his co-

conspirator agreed to advocate the use of force or violence, there was no evidence that the conspirators intended to threaten or create a reasonable fear of violence among the Tamarack residents.

In viewing the sufficiency of the evidence, we look at the evidence in the light most favorable to the government and accept as established all reasonable inferences supporting the verdict. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Yagow,* 953 F.2d 423, 426 (8th Cir.1992). Looking at the evidence in this light, a jury could reasonably find that Lee intended to burn the cross for the purpose of advocating the use of force or violence and his actions were likely to produce such action. In addition, the record supports a jury finding that Lee intended to threaten or create a reasonable fear of violence among the Tamarack residents.

Werner Jahr, the person who came up with the idea of burning the cross, testified that he thought of cross burning as "violence toward blacks." He also testified that he and Lee decided to burn the cross "to make a statement, ... to leave our kids alone." Jahr admitted that his intent in burning the cross was to scare and threaten the blacks in the whole complex, and that he wanted them to move out of the complex. Another person at the party, Christine Kositzke, testified that Lee told her he was going to burn a cross to do something about "the people that (sic) lived upstairs, and that she would see something she had never seen before." Mrs. Miller, a witness called by Lee, was asked what a cross burning means in the South or anywhere else, and she stated:

> Well it is a form of intimidation; the ku klux klan uses it for threats; promises of violence, and that sort of thing.
>
> From what I understand a lot of the cross burnings in the south during the civil rights movement preceded hangings and that sort of thing. Of course, being a black, that is what is (sic) calls to mind.

From this testimony, a jury could reasonably conclude that Lee's intent in burning the cross was more than simply advocating the use of violence. From this testimony, a jury could find that Lee burnt the cross to incite the use of violence and such a result was likely to occur. *See Brandenburg,* 395 U.S. at 447, 89 S.Ct. at 1829. A jury could also find that Lee's actions involved the threatened use of force against the residents of the apartments, or at least intended to cause the residents to reasonably fear that force was imminent. *Cf. Claiborne,* 458 U.S. at 929, 102 S.Ct. at 3434 (no evidence that defendant "authorized, ratified, or directly threatened acts of violence").

The fact that the jury acquitted Lee on Count II of the indictment is of little consequence when we consider the evidence as to Count I in the light most favorable to the government. Count II, among other things, was a substantive count requiring the jury to find that Lee actually used force or the threat of force against the black residents of the Tamarack apartments in violation of their rights to rent and occupy their apartments. *See* 42 U.S.C. § 3631(a). Count I, the conspiracy count, only required an agreement to threaten or intimidate persons in the exercise of their rights secured by the Constitution or the laws of the United States. *See* 18 U.S.C. § 241.

A jury could also view Lee's attempt to conceal his role in the cross burning as evidence that Lee's intent in burning the cross was not the protected activity of advocating an idea but was the unprotected activity of threatening or intimidating the residents of the apartments. Lee told the drinking group who witnessed the cross burning not to tell anyone about the cross burning, and advised them to blame some teenagers for the act.

Judge Lay's statement that there was no evidence that Lee intended to create a reasonable fear of violence among the Tamarack residents cannot be reconciled with the testimony of the black residents who witnessed the cross burning. Pearl Jones testified that she saw the burning cross, that she was afraid, and that the children in her apartment with her who saw the burning cross were afraid and crying. She testified that she believed the cross burning was directed at her, and that she was afraid the group might "come up here and burn us up."

Judge Lay makes much of the fact that Pearl Jones joined the Lee party after the cross burning, and that this negates a finding that Lee's actions were likely to result in imminent lawless action as a matter of law. The fact that Pearl Jones joined the drinking group after the cross burning, however, has nothing to do with whether Lee intended to threaten or intimidate the black residents. Pearl Jones testified that after the police came, she went outside with two other people to talk to the group to find out why they burned the cross. Another witness testified that after Pearl Jones returned to her apartment, she was frightened and stated that she was afraid that when she woke up the "apartment would be burned down and everybody would be killed."

In any event, besides Pearl Jones, there were other witnesses, who testified about their reaction to the cross burning. Angie Jones, Pearl Jones' twelve-year old daughter, testified that she understood that a burning cross meant that "white people were trying to get rid of the blacks," and that when she saw the burning cross she felt "scared and sad," and was "afraid somebody would come up in the hall and take us away." Another resident of the Tamarack Apartments testified that she was with Pearl Jones the night of August 11, 1990, saw the burning cross and that "[t]he kids were really scared ... really upset." She said the kids were asking questions wanting to know what was going on and whether "they [are] going to hurt us." In light of the history of violence associated with the Ku Klux Klan, a jury could reasonably conclude that Lee's intent in burning the cross was to threaten violence. Accordingly, sufficient evidence exists from which a jury could reasonably conclude that by burning the cross Lee intended to threaten acts of violence against the black residents of the apartment or at least intended to cause the residents to reasonably fear the use of imminent force or violence.

Accordingly, we reverse Lee's conviction on Count I of the indictment, and remand for a new trial. At the new trial, the jury should be instructed that it cannot convict on Count I unless it finds that Lee's actions were done with the intent to advocate the use of force or violence and were likely to produce such action; or that Lee intended to threaten the residents of the Tamarack Apartments, or at least intended to cause residents of the Tamarack Apartments to reasonably fear the use of imminent force or violence. In addition to the judges joining in this opinion, Judges Lay, Loken and Morris S. Arnold concur in the result we reach and in the court's judgment.

LAY, Senior Circuit Judge, concurring and dissenting, with whom LOKEN and MORRIS SHEPPARD ARNOLD, Circuit Judges, join.

I would think there could be little doubt that error in the court's instruction requires reversal of defendant's conviction for conspiracy under 18 U.S.C. § 241. We therefore join in the result reached by Judge John R. Gibson's opinion. However, we would go further and hold that there exists insufficient evidence to sustain a retrial on the conspiracy count.

In the present case the district court expressly instructed the jury that to threaten or intimidate under § 241 did not require "a threat of physical force or the intimidation of physical fear." Clearly this was fundamental error. The First Amendment protects speech including "virulent ethnic and religious epithets." *United States v. Eichman*, 496 U.S. 310, 318, 110 S.Ct. 2404, 2409, 110 L.Ed.2d 287 (1990). In *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 902, 102 S.Ct. 3409, 3420, 73 L.Ed.2d 1215 (1982), Charles Evers (the Field Secretary of the NAACP in Mississippi) gave a speech calling for a boycott of white-owned businesses in which he threatened "[i]f we catch any of you going in any of them racist stores, we're gonna break your damn neck." The Supreme Court held this threat to be protected speech. *Id.* at 927, 102 S.Ct. at 3433.[1]

---

1. *See also Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949) ("freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest") (citation omitted); *R.A.V. v. City of St.*

My disagreement with the majority opinion is (1) it fails to distinguish between the conspiracy conviction under Count I, upon which Lee was convicted .and Count II, the substantive charge under 42 U.S.C. § 3631(a) (1988) [2] of which the defendant was acquitted; and in doing so (2) it fails to evaluate the total lack of evidence to sustain the conspiracy count.

There can be little question that § 241 as applied in the present case focuses on Lee's expressive conduct, to wit, the burning of the cross. Lee did not verbally threaten or intimidate anyone. He burned a cross "to take a stand" and "maybe ... bad blacks ... would take the message seriously ' and leave." [3]

It is difficult to infer that Lee, in burning the cross, was advocating the use of force or violence. However, even if such an obscure inference may imply that this was his intent, the Supreme Court has made clear "the mere *advocacy* of use of force or violence does not remove speech from the protection of the First Amendment." *Claiborne*, 458 U.S. at 927, 102 S.Ct. at 3433 (emphasis in original).

In *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), white supremacists burned a cross and gave speeches with express threats to "bury the niggers." *Id.* at 446 & n. 1, 89 S.Ct. at 1829 n. 1. The defendant arranged for a television station to broadcast the cross burning and the speeches. He was convicted under the Ohio Criminal Syndicalism statute. The Supreme Court reversed the conviction, finding the defendant's conduct, although highly intimidating, nevertheless protected under the First Amendment. The Court made clear that:

> the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is. likely to incite or produce such action.

*Id.* at 447, 89 S.Ct. at 1829. .

The majority's analysis focuses on two recent cases—*Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), and *Boos v. Barry*, 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988)—reasoning that violation of First Amendment rights "depends on the likely communicative impact" of the conduct involved. In *Boos*, the Court noted that the government's justification for the ordinance at issue focused on the "direct impact" of the speech on its audience. 485 U.S. at 321, 108 S.Ct. at 1163-64. Similarly, in *Johnson* the issue of whether the burning of the flag violated the law depended on the "likely communicative impact of [Johnson's] expressive conduct." 491 U.S. at 411, 109 S.Ct. at 2543.

Unlike the present case, *Johnson* and *Boos* did not involve the conspiracy under 18 U.S.C. § 241. Johnson was charged with desecration of a venerated object (the flag) in violation of Texas Penal Code Ann. § 42.-09(a)(3) (1989). The only *evidence* offered by the state to show the communicative impact of the flag burning was the testimony of several persons, who stated that it had seriously offended them. *Id.* at 408, 109 S.Ct. at 2541. No disturbance of the peace actually

---

Paul, Minnesota, —— U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); *Collin v. Smith*, 578 F.2d 1197 (7th Cir.), *cert. denied*, 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978). For an interesting discussion of distinctions between protected and unprotected symbolic conduct, see Charles H. Jones, *Proscribing Hate: Distinctions Between Criminal Harm and Protected Expression*, 18 Wm. Mitchell L.Rev. 935 (1992).

2. The jury acquitted Lee on Count II of the indictment which charged him with interfering with housing rights by means of force or *threat of force* in violation of 42 U.S.C. § 3631(a) (1988).

3. There should be little doubt that Lee's conduct was "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." ' *Spence v. Washington*, 418 U.S. 405, 409–41, 94 S.Ct. 2727, 2729–3052, 41 L.Ed.2d 842 (1974). The prosecution was aimed at Lee's conspiracy of an *expressive threat*, therefore applying § 241 to the alleged conspiracy was obviously directed toward suppressing communication and not regulation of non-communicative conduct. Under such circumstances, we agree with Judge John R. Gibson's opinion that *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1967), is not applicable. *Id.* at 382, 88 S.Ct. at 1682.

occurred or threatened to occur because of Johnson's flag burning. *Id.* The Court pointed out that the mere possibility of a breach of the peace was not sufficient to punish symbolic advocacy expressing dissatisfaction over "conditions as they are." *Id.* at 408–09, 109 S.Ct. at 2541–42.

*Boos* similarly did not involve a conspiracy. *Boos* was charged under § 22–1115 of the District of Columbia Code prohibiting display of odious signs within 500 feet of a foreign embassy. 485 U.S. at 315, 108 S.Ct. at 1160. In holding the display clause unconstitutional, the Court found the regulation to be a content-based restriction and held that the emotive impact of speech was not a "secondary effect." *Id.* at 321, 108 S.Ct. at 1164.

If the present appeal addressed the sufficiency of the evidence of the substantive offense under § 3631(a),[4] *Johnson* and *Boos* would require a finding that there was insufficient evidence on the record before us to sustain the conviction. Indeed, the jury agreed when it acquitted Lee of violating this section. The evidence shows that Lee's conduct in burning the cross was not directed to inciting imminent lawless action. Lee placed the cross not in front of a particular family's apartment window, but in a field some 386 feet from the apartment buildings, more than the length of a football field. There is no evidence that Lee attempted to call black residents' attention to the burning cross. When the cross failed to light along one arm, Lee did not attempt to reignite it. Lee's statement that he burned the cross to take a stand and that maybe the blacks would leave is no different than the Nazi march through Skokie, Illinois, where a message of intolerance to Jews was advocated and yet not

actionable. *See Collin v. Smith,* 578 F.2d 1197 (7th Cir.1978).

Moreover, as in *Johnson* and in *Boos,* the prosecution produced no evidence of disruptive conduct. The cross never fully ignited and burned very briefly, less than sixty seconds. No acts of violence occurred after the incident. Shortly after the cross burning, Pearl Jones, the black resident of the apartments who testified that she saw the cross from her balcony, joined defendant and his friends at a picnic table for beer and pizza; she partied with them for a few hours, discussing racial problems at the apartment complex. Merely because Lee has expressed through the cross burning a belief which society regards as reprehensible does not mean that imminent lawless action will follow. As the Court noted in *Johnson,* 491 U.S. at 409, 109 S.Ct. at 2542, "we have not permitted the government to assume that every expression of a provocative idea will incite a riot...."

In the last line of the opinion, the majority suddenly shifts its analysis from the imminent lawless action standard and suggests that the jury could find that Lee's conduct in burning the cross was an unprotected threat. Thus, the majority requires the district court to instruct the jury that it may convict if it finds that "Lee intended to threaten the residents of the Tamarack Apartments, or at least intended to cause the residents of the Tamarack Apartments to reasonably fear the use of imminent force or violence." Maj.Op. at 1304. As with the lack of evidence to show any imminent lawless action, this standard has not been met as a matter of law.

Threats must be analyzed in the light of their entire factual context. *See United States v. Gilbert,* 884 F.2d 454, 457 (9th

---

**4.** 42 U.S.C. § 3631(a) provides:

    Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

    (a) any person because of his race, color, religion, sex, handicap (as such term is defined in section 3602 of this title), familial status (as such term is defined in section 3602 of this title), or national origin and because he is or has been selling, purchasing, renting, financing, occupying, or contracting or negotiating for the sale, purchase,

rental, financing or occupation of any dwelling, or applying for or participating in any service, organization, or facility relating to the business of selling or renting dwellings;

    . . .

    . . . .

shall be fined not more than $1,000, or imprisoned not more than one year, or both; and if bodily injury results shall be fined not more than $10,000, or imprisoned not more than ten years, or both; and if death results shall be subject to imprisonment for any term of years or for life.

Cir.1989), *cert. denied,* 493 U.S. 1082, 110 S.Ct. 1140, 107 L.Ed.2d 1044 (1990). Here, considering the surrounding events, the cross burning was not a threat. The cross was not focused on one particular individual, but rather was placed 386 feet away from a three-building apartment complex with at least 15 black families. The majority cites the testimony of several witnesses that the cross burning caused them to be afraid. This testimony on the diffused effect of apprehension in no way tends to prove imminent lawless action or intent to threaten. The Supreme Court discredited this type of reasoning almost twenty-five years ago, when it stated that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker v. Des Moines Indep. Community School Dist.,* 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969).

In the present case, however, we deal with the question of whether there existed a conspiracy (an agreement) to "injure, oppress, threaten, or intimidate" an individual in "any right or privilege secured to him by the Constitution or laws of the United States," here the right to occupy a dwelling free of force or threats of force.

In prosecuting a criminal conspiracy case, the evidence of what actually occurred does not necessarily defeat proof of the conspiracy. The focus must be on the agreement and on what Lee and his coconspirator intended. In evaluating this particular conspiracy charge under 18 U.S.C. § 241, the question is whether Lee and his fellow conspirators agreed to "injure, oppress, threaten, or intimidate" an individual from exercising his right to housing. Here, in burning the cross Lee and the coconspirator intended to advocate that "bad blacks should leave." This was the extent of the agreement, an agreement that involved only the intent to use symbolic speech to send a message. There is no evidence that Lee and his fellow conspirator plotted to burn the cross for the purpose of advocating the use of force or violence. *See NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 927, 102 S.Ct. 3409, 3433, 73 L.Ed.2d 1215 (1982).

Lee and his fellow conspirator intended only to express their viewpoints about blacks symbolically, a view which may be repugnant but which is nonetheless protected speech. It is difficult for me to comprehend why, when the object of the conspiracy—symbolic speech—is not unlawful (*see Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), and *Boos v. Barry,* 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988)), the conspiracy (planning of the symbolic speech) may nevertheless be prosecuted. In a conspiracy charge, the government must prove that the defendant knowingly agreed to become a party to the conspiracy, that the conspirators intended to do an unlawful act, and that an overt act was committed by one of the conspirators in furtherance of the conspiracy. *See generally* Barry Tarlow, *Defense of a Federal Conspiracy Prosecution,* 4 J.Crim.Defense 183, 186–209 (1978). Moreover, the object of the conspiracy must be unlawful. *Id.* at 201–02.

Even if Lee and his fellow conspirators had agreed to advocate the use of force or violence, a proposition that I find highly speculative, then the *critical* issue is whether their planned advocacy was "directed to inciting or producing imminent lawless action" and was "likely to incite or produce such action." *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). The majority suggests that Lee may be convicted if Lee intended to cause the residents of the apartments to "reasonably fear" that force was imminent. However, the proper question, if different facts existed than presented here, is whether the conspirators, by burning the cross, *intended* that immediate violence or force would ensue. Here, considering all of the facts and circumstances leading up to the actual burning of the cross, there is no credible evidence that Lee and his coconspirators willfully intended to produce imminent violence or force or, for that matter, a reasonable fear that lawless action was imminent.

On this basis, I would vacate the judgment of conviction and remand to the district court to enter a judgment of acquittal.

**1308**

McMILLIAN, Circuit Judge, with whom FAGG, MAGILL and BEAM, Circuit Judges, join, dissenting.

> Everyone, irrespective of the colour of their skin, is entitled to walk through our streets in peace, with their heads erect, and free from fear.... As far as the law is concerned you are entitled to think what you like, however foul your thoughts; to feel what you like, however brutal and debased your emotions; to say what you like providing you do not infringe the rights of others ..., but once you translate your dark thoughts and brutal feelings into savage acts ... the law will be swift to punish you, ... and to protect your victims.

*Four–Year Terms for Nine "Nigger–Hunting" Youths,* (Quoting Justice Cyril Barnet Salmon at the time he sentenced nine youths who had pleaded guilty to various crimes committed in and around London's Notting Hill area.) The London Times, Sep. 16, 1958, at 4.

I cannot accept the majority's view that "an apparently limitless variety of conduct can be labeled [protected] 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1967) (*O'Brien*). In fact, "acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *R.A.V. v. City of St. Paul,* — U.S. —, ———–———, 112 S.Ct. 2538, 2546–47, 120 L.Ed.2d 305 (1992) (*R.A.V.*). In the present case Lee was not prosecuted and convicted for expressing an idea or a philosophical point of view. He was prosecuted and convicted because he conspired to threaten and intimidate the African–American residents of the Tamarack Apartments in the exercise of their federally-guaranteed housing rights. Such conduct is not protected by the First Amendment because "[v]iolence or other types of potentially expressive activities that produce special harms distinct from their communicative impact ... are entitled to no constitutional protection." *Roberts v. United States Jaycees,* 468 U.S. 609, 628, 104 S.Ct. 3244, 3255,

82 L.Ed.2d 462 (1984) (*Roberts*). Accordingly, I dissent and would affirm the conviction.

Government limitations on expressive conduct do not violate an individual's freedom of expression if: the government has the constitutional power to regulate it; the regulation furthers an important or substantial government interest; the governmental interest is unrelated to the suppression of free expression; and the incidental restriction on first amendment freedoms is no greater than is essential to the furtherance of that interest. *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679.

The *O'Brien* analysis was reaffirmed by the Supreme Court in *Barnes v. Glen Theatre, Inc.,* — U.S. —, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (*Barnes*). In *Barnes* the Court held that the government's interest in protecting societal order and morality was "unrelated to the suppression of free expression." *Id.* at —, 111 S.Ct. at 2462 (plurality opinion); *id.* at —, 111 S.Ct. at 2463 (Scalia, J., concurring); *id.* at —, 111 S.Ct. at 2468 (Souter, J., concurring). While agreeing that the dancing to which the Indiana statute at issue was applied had a "communicative element," the Court concluded that "it was not the dancing that was prohibited, but simply its being done in the nude." *Id.* at —, 111 S.Ct. at 2463 (plurality opinion).

Applying the *O'Brien* standard to the present case, it is clear that 18 U.S.C. § 241 as applied to Lee did not violate his First Amendment freedoms because he was not convicted for burning a cross in an effort to express an idea. Title 18 U.S.C. § 241 prohibits conspiracies to interfere with federally protected rights. Congress has the power under the Fourteenth Amendment and under the Commerce Clause to prohibit interference with the constitutional and legal rights of others. *See* S.Rep. No. 721, 90th Cong., 2d Sess. 2, *reprinted in* 1968 U.S.C.C.A.N. 1837, 1841–43 (discussing constitutional authority for enacting 42 U.S.C. § 3631 and amending 18 U.S.C. § 241). Furthermore, the government has an interest in protecting the citizens of the United States in the free exercise of their constitutional and legal rights, including the right to live where they choose without fear of oppression, threats,

intimidation, injury, or interference. Title 18 U.S.C. § 241 specifically furthers this legitimate government interest by criminalizing conduct which interferes with the free exercise of such rights.

The government's interest in prohibiting conspiracy to interfere with such rights is unrelated to the suppression of free expression. Section 241 as applied only prohibits conspiracy to willfully intimidate or interfere with the exercise and enjoyment of legal rights by identifiable victims because of their race or color, not the expression or advocacy of ideas. The extent to which this restriction incidentally affects Lee's right to freely express himself by burning a cross is no greater than is essential to further the substantial and important government interest protected by the statute. In other words, Lee's ability to burn a cross is restricted only if done with the specific intent to conspire to intimidate or threaten the free exercise and enjoyment of the legal rights of others.

Contrary to the majority's argument, the Supreme Court in *R.A.V.* did not hold that "cross burning" is symbolic expression protected by the First Amendment; rather, the Court held that cross burning could have been punished under a number of statutes. —— U.S. at —— & n. 1, 112 S.Ct. at 2541 & n. 1. In *R.A.V.* the Court determined that the form of expression reached by the Minnesota statute at issue was proscribable under the "fighting words" doctrine. However, the court concluded that the ordinance was facially unconstitutional because it prohibited "otherwise permitted speech solely on the basis of the subjects the speech addresses." *Id.* at ——, 112 S.Ct. at 2542.

While concluding that certain fighting words could consistent with the First Amendment "be regulated *because of their constitutionally proscribable content* (obscenity, defamation, etc.)," *id.* at ——, 112

S.Ct. at 2543, the Court held that those categories could not be "made the vehicles for content discrimination unrelated to their distinctively proscribable content." *Id.* Hence, the Court concluded that certain categories of expression may be proscribed on one basis but not on others. *Id.* at ——, 112 S.Ct. at 2544.

In analyzing content-based regulations, the Court in *R.A.V.* articulated some restrictions that would survive First Amendment scrutiny. In the first instance the Court indicated that "when the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists."[5] *Id.* at ——, 112 S.Ct. at 2545.

The Supreme Court also determined that the government may make content-based distinctions among subclasses of expression where "the [particular] subclass happens to be associated with particular 'secondary effects' of the speech, so that the regulation is *justified* without reference to the content of the ... speech.'" *Id.* at ——, 112 S.Ct. at 2546 (citing *Renton v. Playtime. Theatres, Inc.*, 475 U.S. 41, 48, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986)). By way of explanation, the Court indicated that "since words can in some circumstances violate laws directed not against speech but against conduct (a law against treason, for example, is violated by telling the enemy the nation's defense secrets), a particular content-based subcategory of proscribable class of speech can be swept up incidentally within the reach of a statute directed at conduct rather than speech." *R.A.V.*, —— U.S. at ——, 112 S.Ct. at 2546 (citations omitted).

The Supreme Court cited Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, and Equal Employment Opportunity Commission Guidelines prohibiting sexual harass-

---

**5.** As an example of this type of restriction the Court pointed to 18 U.S.C. § 871, the federal statute that prohibits threats against the life of the President. The Court concluded that this statute was valid "since the reasons why threats of violence are outside the First Amendment (protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence

will occur) have special force when applied to the person of the President." *R.A.V.*, —— U.S. at ——, 112 S.Ct. at 2546, citing *Watts v. United States*, 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969). However, the government cannot only prohibit threats against the President that are made as a result of a specific policy. *Id.* —— U.S. at ——, 112 S.Ct. at 2546.

ment in the workplace, 29 C.F.R. § 1604.11; 18 U.S.C. § 242; and 42 U.S.C. §§ 1981, 1982, as example of statutes that are directed against conduct rather than expression. The Court concluded that "sexually derogatory 'fighting words'" in the workplace can be prohibited as a violation of Title VII's proscription of gender discrimination in employment. *R.A.V.*, — U.S. at —, 112 S.Ct. at 2546. Sexual harassment violates Title VII when it "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.11(a)(3) (1988). Additionally, it is a violation of federal law to discriminate in employment because of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (1988); *see also International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977) ("Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII."). Therefore, the government may prohibit interference with an individual's employment status, even in circumstances where the interference consists solely of speech. It is the conduct that the government prohibits, not the expressive content of the speech.

Lastly, the Court in *R.A.V.* determined that a content-based regulation would not be prohibited if "the nature of the content discrimination is such that there is no realistic possibility that official suppression of ideas is afoot." — U.S. at —, 112 S.Ct. at 2547. After careful analysis, the Supreme Court concluded that the St. Paul Ordinance did not fall within any of the above exceptions. *Id.* at —, 112 S.Ct. at 2549.

Contrary to the majority's conclusion, the decision in *R.A.V.* reinforces the conclusion that Lee was convicted for intentionally conspiring to threaten and intimidate others in violation of 18 U.S.C. § 241, conduct that is outside the protection of the First Amendment. Unlike "[t]he ordinance struck down in *R.A.V.* [which] was explicitly directed at expression (i.e., 'speech' or 'messages,' ...), the statute in this case is aimed at conduct unprotected by the First Amendment." *Wis-*

*consin v. Mitchell,* — U.S. —, —, 113 S.Ct. 2194, 2201, 124 L.Ed.2d 436 (1993) (*Mitchell*); *see also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916, 102 S.Ct. 3409, 3427, 73 L.Ed.2d 1215 (1982) ("The First Amendment does not protect violence.").

I also disagree with the majority's conclusion that the Supreme Court's decision in *Mitchell* does not affect the analysis of this case. As the majority has acknowledged, *supra* at 1298, in *Mitchell* the Court upheld a statute providing for an enhanced penalty where a defendant selects his victim on account of the victim's race, religion, color, disability, sexual orientation, national origin, or ancestry, concluding that the prohibited conduct was unprotected by the First Amendment. *Id.* — U.S. at —, 113 S.Ct. at 2201–02. In *Mitchell* the Court also held that a defendant's expression of bigotry may constitutionally be used "to establish the elements of a crime or to prove motive or intent." *Id.* Thus, the Supreme Court once again restated the axiom that the First Amendment is not violated by a statute on the ground that it proscribes conduct motivated by discrimination. *Id.* at —, 113 S.Ct. at 2200, citing *Roberts*, 468 U.S. at 628, 104 S.Ct. at 3255; *Hishon v. King & Spalding*, 467 U.S. 69, 78, 104 S.Ct. 2229, 2235, 81 L.Ed.2d 59 (1984); *Runyon v. McCrary*, 427 U.S. 160, 176, 96 S.Ct. 2586, 2597, 49 L.Ed.2d 415 (1976); 42 U.S.C. § 2000e–2(a)(1); 18 U.S.C. § 242; 42 U.S.C. §§ 1981 and 1982.

Similar to the statute in *Mitchell*, 18 U.S.C. § 241 is a statute directed at conduct that is not within the ambit of the First Amendment. It does not regulate expression but prohibits categories of proscribable expressive conduct intended to interfere with the rights of others in the exercise of their federally guaranteed rights. *R.A.V.*, — U.S. at — – —, 112 S.Ct. at 2548–49. Section 241 has consistently been upheld as a valid exercise of governmental authority to enforce the rights guaranteed by the laws of the land. *See, e.g., United States v. Johnson*, 390 U.S. 563, 565, 88 S.Ct. 1231, 1233, 20 L.Ed.2d 132 (1968) ("18 U.S.C. § 241 ..., as noted, protects the citizen 'in the free exercise or enjoyment of any right or privilege

secured to him by the Constitution or laws of the United States.' "); · *United States v. Guest,* 383 U.S. 745, 759, 86 S.Ct. 1170, 1178, 16 L.Ed.2d 239 (1966) ("It is also well settled in our decisions that the federal commerce power authorizes Congress to legislate for the protection of individuals from violations of civil rights that impinge on their free movement in interstate commerce.") (citations omitted); *United States v. Price,* 383 U.S. 787, 798, 86 S.Ct. 1152, 1159, 16 L.Ed.2d 267 (1966) ("§ 241 must be read as it is written—to reach conspiracies 'to injure ... any citizen in the free exercise or enjoyment of any right or privilege ...'; that this language includes rights or privileges protected by the Fourteenth Amendment"). Hence, the application of § 241 to Lee does not violate his Constitutional right of free expression.

Today the majority reverses Lee's conviction on Count I with instructions that he should be retried and the jury instructed that it should convict him only if it finds that "Lee's actions were done with the intent to advocate the use of force or violence and were likely to produce such action; or that Lee intended to threaten the residents of the Tamarack Apartments, or at least intended to cause residents of the Tamarack Apartments to reasonably fear the use of imminent force or violence." *Supra,* at 1304. Although the jury instructions as a whole may have been somewhat inconsistent, the jury was given an instruction similar to that advocated by the majority: "In order to constitute a criminal conspiracy under Count I, the defendant's actions must have been taken with the specific intent to intimidate or interfere with the residents['] right to occupy a dwelling free of force or threats of force." Tr. at 519.

As the majority concedes, "the record supports a·jury finding that Lee intended to threaten or create a reasonable fear of violence among the Tamarack residents." *Supra,* at 1303. Pearl Jones, her family and friends saw the cross burning from her balcony. Both Pearl Jones and her daughter testified that they were afraid that whoever had burned the cross was going to come up and burn them out of their apartment. Addi-

tionally, their fear of physical harm was corroborated by another witness. Therefore, there was substantial evidence to convict Lee of violating § 241, and any error in instructing the jury that "[t]o threaten or intimidate does not require a threat of physical force or the intimidation of physical fear," Tr. at 517, was harmless.

Moreover, I find no support for the majority's proposition that the only way that the First Amendment is not violated by the application of § 241 is if limited to threats of the imminent use of physical force. In fact, such a requirement would invalidate a number of criminal statutes expressly prohibiting threats of harm through nonviolent means. *See, e.g.,* 18 U.S.C. §§ 601(a) (prohibiting the solicitation of campaign contributions through threats of the loss of government employment or benefits), 873 (prohibiting "a threat of informing ... against any violation of any law of the United States"), 874 ("threat of procuring dismissal from employment"), 875(d) ("threat to injure the property or reputation.... or any threat to accuse the addressee ... of a crime"), 876 (same), 877 (same); 891(7) (defining "extortionate means" to include "an express or implicit threat ... of violence or other criminal means to cause harm to the person, reputation or property of any person").

Furthermore, I am not persuaded by the majority's reliance on *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (*Brandenburg*), that § 241 may be applied to Lee's prosecution as long as it is limited to punishing expression "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* In *Brandenburg,* the Supreme Court held that a criminal statute as applied to a Ku Klux Klan rally violated the First Amendment. Unlike the present case, the Ohio statute failed to distinguish between "the mere abstract teaching of ... the necessity for violence" and "preparing a group for violent action." *Id.* at 448, 89 S.Ct. at 1830. Thus, in *Brandenburg,* the Klansmen were convicted of violating a statute which purported to punish them merely for advocating certain proscribed conduct. In contrast, Lee was· prosecuted and convicted not for mere

advocacy of proscribed conduct, but for proscribed conduct, conspiracy to burn a cross for the purpose of directly intimidating and threatening the African–American residents of the Tamarack apartments.

Although in some circumstances burning a cross may be considered mere advocacy, where cross burning is done with the specific intent to intimidate and threaten identifiable victims as here, I firmly believe that the cross burning is not conduct protected by the First Amendment. I respectfully dissent and would affirm Lee's conviction.