# Use of Federal Employees for Olympic Security

Where the teams and delegations visiting the United States for the Olympic Games in Atlanta have been designated "official guests" of the United States by the Secretary of State pursuant to §§ 112, 1116 and 1201 of the Criminal Code, those provisions authorize federal agencies to provide their employees to assist in security operations at the Atlanta Olympics upon request of the Attorney General.

May 17, 1996

MEMORANDUM OPINION FOR THE DEPUTY ATTORNEY GENERAL

This responds to your request for our opinion whether the provisions of §§ 112(f), 1116(d), and 1201(f) of the Criminal Code, 18 U.S.C. §§ 112(f), 1116(d), and 1201(f), authorize federal agencies, upon request of the Attorney General, to provide their employees to assist in security operations at the Atlanta Olympics. Under the circumstances presented, we conclude that they do.

## I.

The City of Atlanta, Georgia, will host the 1996 Summer Olympics. The organizing entity for the Atlanta Games is the Atlanta Committee for the Olympic Games ("ACOG"), which will be working in close concert with the City of Atlanta in managing and facilitating the Summer Games. In light of the international attention focused on the games, the large number of athletes, spectators, and others who will be present at the games, and the tragic events of the Munich Olympics, federal and state authorities have focused on the importance and challenge of maintaining appropriate security.

Among other significant measures, we understand that, at ACOG's request, the Administration plans to provide approximately 1,000 federal employees to assist with security, principally the operation of metal and weapons detectors at various Olympic security checkpoints. To the extent permissible, eligible employees will be drawn from department and agency offices in the Atlanta area, including the Departments of Agriculture, Commerce, Education, Energy, Health and Human Services, Labor, Transportation, and Treasury; the General Services Administration; the Small Business Adminstration; the Social Security Administration; and the Office of Personnel Management.

For purposes of this memorandum, we assume that the Secretary of State will, in keeping with past practice, designate the Olympic delegations from the participating nations as "official guests" of the United States pursuant to §§ 112, 1116, and 1201 of the Criminal Code. See 18 U.S.C. §§ 112, 1116, and 1201; 22 C.F.R. §§ 2.2–2.5 (1996). Such designations would place these delegations under the coverage of special federal laws protecting foreign officials and "official guests" of the United States from murder, kidnapping, and assault. "In the course of en-

forcement" of these provisions, moreover, the Attorney General is authorized to "request assistance from any Federal, State, or local agency." *E.g.*, 18 U.S.C. § 1116(d).

We consider below whether, under these provisions, the Attorney General may seek, and whether federal agencies may provide, the 1,000 employees needed to assist with security at the Atlanta Olympics. For reasons discussed below, we conclude that they may do so. For purposes of this memorandum, we assume that federal agencies providing such requested assistance to the Attorney General would do so on a non-reimbursable basis. We suggest, however, that the Attorney General enter into a Memorandum of Understanding with each federal agency providing such assistance, recording the authority, scope, funding, and supervisory arrangements for the activities to be undertaken by such agency.

## II.

In 1972, Congress enacted the Act for the Protection of Foreign Officials and Official Guests of the United States, Pub. L. No. 92–539, 86 Stat. 1070 (1972) ("Official Guests Act" or "OGA"), which established three federal crimes of violence against official guests of the United States: 18 U.S.C. § 1116 covers murder, manslaughter, and attempted murder; 18 U.S.C. § 1201 covers kidnapping, abduction, and similar offenses; and 18 U.S.C. § 112 covers various forms of assault and the offering of violence. An "official guest" is defined as "a citizen or national of a foreign country present in the United States as an official guest of the Government of the United States pursuant to designation as such by the Secretary of State." *Id.* § 1116(b)(6).

Four years later, Congress enacted the Act for the Prevention and Punishment of Crimes Against Internationally Protected Persons, Pub. L. No. 94–467, 90 Stat. 1997 (1976) ("IPPA" or "1976 Act"), which amended the above-described provisions. The IPPA was enacted, in turn, to implement two international conventions to which the United States was a signatory: the Convention to Prevent and Punish the Acts of Terrorism Taking the Form of Crimes Against Persons and Related Extortion That Are of International Significance, Feb. 2, 1971, 27 U.S.T. 3949, T.I.A.S. No. 8413 ("OAS Convention"); and the Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents, Dec. 28, 1973, 28 U.S.T. 1975, T.I.A.S. No. 8532 ("UN Convention"). In addition, the IPPA amended §§ 112, 1116, and 1201 to authorize the Attorney General to obtain the assistance of federal agencies and state and local governments in the enforcement of these criminal statutes.

Section 2 of the IPPA, now codified at 18 U.S.C. §§ 112(f), 1116(d), and 1201(f), provides (emphasis added):

> In the course of enforcement of [sections 112, 1116, and 1201 of the Criminal Code] and any other sections prohibiting a conspiracy or attempt to violate [those sections], *the Attorney General may request assistance from any Federal, State or local agency, including the Army, Navy, and Air Force, any statute, rule, or regulation to the contrary notwithstanding.*

In our view, this provision authorizes federal agencies to assist the Attorney General in responding to criminal offenses covered by the referenced statutes. Indeed, this Office has previously opined that the provision authorizes federal agencies (including the Armed Services) to respond to "terrorist activity, including hostage-taking, directed at . . . visiting Olympic athletes while they are in the United States." Memorandum for Paul R. Michel, Acting Deputy Attorney General, from Larry L. Simms, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Possible Use of Armed Forces in the Event of Terrorist Activity at the Lake Placid Olympics* at 1 (Feb. 5, 1980).[1]

The further question presented here is whether the IPPA authorizes the Attorney General to request assistance from federal agencies where no violation of the governing criminal statutes has yet occurred, but under circumstances in which there exists cause to believe that, without appropriate security, "official guests" of the United States might be at risk. That question primarily turns on the meaning of the phrase, "[i]n the course of enforcement" of §§ 112, 1116, and 1201 of the Criminal Code.

The starting point in interpreting this provision is, of course, the plain language of the statute. *See Ardestani v. INS*, 502 U.S. 129, 135 (1991). As this Office has previously noted, "[t]he concept of 'enforcement' is a broad one, and a given statute may be 'enforced' by means other than criminal prosecutions brought directly under it." *See Admissibility of Alien Amnesty Application Information in Prosecutions of Third Parties*, 17 Op. O.L.C. 172, 177 (1993). There, we further noted that, in the context of the statute at issue, the statutory authority to enforce a criminal provision included both "the prevention and punishment" of the underlying criminal conduct.[2] *Id.* We have also opined that a statute declaring it "unlawful . . . for any alien to depart from the United States except under" rules prescribed by the President provides the Attorney General with authority to "prevent" such departures by, for example, keeping individuals under surveillance and screening their contacts with others who might seek to coerce them to depart

---

[1] As noted in the 1980 opinion, the Secretary of State had designated the visiting Olympic athletes as "official guests of the United States" pursuant to the OGA. This opinion is based upon an assumption that the 1996 Olympic delegations will also be so designated.

[2] This broad understanding of the word "enforce" is reflected in dictionary definitions of the term as well. *See, e.g., The American Heritage Dictionary of the English Language* 433 (1st ed. 1976) (defining "enforce" to mean "1. To compel observance of or obedience to: enforce a regulation."); *Black's Law Dictionary* 528 (6th ed. 1991) (defining "enforcement" to mean "The act of putting something such as a law into effect; the execution of a law; the carrying out of a mandate or command.").

in violation of the law. *See Department of Justice Authority to Provide "Protective Custody" for Defectors*, 4B Op. O.L.C. 348, 353 (1980). In reaching this conclusion, moreover, we stressed that "law enforcement authorities customarily have great discretion to decide how to enforce the law." [3] *Id.*

A construction of the word "enforcement" that is broad enough to include preventive measures is also consistent with a variety of other federal statutes that define the phrase "law enforcement officer" to include those engaged in not only the apprehension and prosecution of those who have violated the law, but also "the prevention" of criminal violations.[4] Similarly, another federal statute defines "enforcement of the criminal laws" to include, among other things, "efforts to *prevent, control, or reduce crime.*" 5 U.S.C. § 552a(j)(2) (emphasis added).

When the phrase "in the course of enforcement" is placed in its statutory context, we are left with little doubt that it is properly read to include preventive, as well as responsive, crime control efforts. Significantly, the two acts at issue here are entitled the "Act for the *Protection* of Foreign Officials and Official Guests of the United States," 86 Stat. at 1070 (emphasis added), and the "Act for the *Prevention* and Punishment of Crimes Against Internationally Protected Persons," 90 Stat. at 1997, Preamble (emphasis added). In explicitly declaring their protective and preventive purposes, the titles of these statutes provide additional support for a broad interpretation of the term "enforcement" as used in IPPA's assistance provisions.[5] The 1976 Act, moreover, was expressly enacted "to implement the 'Convention to *Prevent* and Punish the Acts of Terrorism Taking the Form of Crimes against Persons and Related Extortion That Are of International Significance' and the 'Convention on the *Prevention* and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents.' " *Id.* (emphasis added). *See also CISPES v. FBI*, 770 F.2d 468, 472 (5th Cir. 1985).

---

[3] *See also* Memorandum for Wayne B. Colburn, Director, United States Marshals Service, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Law Enforcement Authority of Special Deputies Assigned to DOT to Guard Against Air Piracy* (Sept. 30, 1970). Relying on the Supreme Court's opinions in *In Re Neagle*, 135 U.S. 1 (1890) and *In Re Debs*, 158 U.S. 564 (1895), we there concluded: "It is our view that since the United States has jurisdiction to punish air piracy and related offenses, it likewise has inherent authority to take reasonable and necessary steps to prevent these offenses." *Id.* at 2.

[4] *See, e.g.* (emphasis added throughout), 18 U.S.C. § 115(c)(1) (" 'Federal law enforcement officer' means any officer, agent, or employee of the United States authorized by law or by a Government agency to engage in or supervise the *prevention*, detection, investigation, or prosecution of any violation of Federal criminal law"); 18 U.S.C. § 3592(c)(14) ("For purposes of this subparagraph, a 'law enforcement officer' is a public servant authorized by law or by a Government agency or Congress to conduct or engage in the *prevention*, investigation, or prosecution or adjudication of an offense"); 18 U.S.C. § 3673 ("the term 'law enforcement officer' means a public servant authorized by law or by a government agency to engage in or supervise the *prevention*, detection, investigation, or prosecution of an offense"); 42 U.S.C. § 3796dd–8 (" 'career law enforcement officer' means a person hired on a permanent basis who is authorized by law or by a State or local public agency to engage in or supervise the *prevention*, detection, or investigation of violations of the criminal laws").

[5] It is well-recognized that the title of a statute can provide useful evidence of legislative intent in interpreting the statute. *See INS v. National Ctr. for Immigration Rights, Inc.*, 502 U.S. 183, 189 (1991); 2A Norman J. Singer, *Sutherland Statutory Construction* § 47.03 (5th ed. 1992) ("Since the title of an act is essentially a part of the act and is itself a legislative expression of the general scope of the bill, it is proper to consider it in arriving at the intent of the legislature.").

Those international conventions, moreover, clearly impose an obligation on sig-
natory states not simply to punish those who commit acts of violence against
protected persons, but also to prevent such violence from occurring in the first
place. Article 4 of the UN Convention, for example, provides in relevant part:

> States Parties shall co-operate in the *prevention* of the crimes
> set forth in article 2 [i.e., those crimes covered by the statutes in
> issue here], particularly by:
>
> (a) taking *all practicable measures to prevent preparations in
> their respective territories for the commission of those crimes with-
> in or outside their territories*;
>
> (b) exchanging information and co-ordinating the taking of ad-
> ministrative and other measures as appropriate to prevent the com-
> mission of those crimes.

28 U.S.T. at 1979 (emphasis added). The OAS Convention makes similar provi-
sion.[6]

The language and statutory context of the IPPA thus provide persuasive support
for the view that its provisions should be understood to authorize the Attorney
General to take "practicable measures" to prevent the commission of violent
crimes against "official guests" of the United States.[7]

## III.

### A.

The legislative history of the OGA and IPPA further confirms our view that
the Attorney General may request assistance from any federal agency in both pre-
venting and punishing acts of violence against Olympic delegations visiting the
United States. As originally drafted, the OGA covered only "foreign officials."

---

[6] Article 1 of the OAS Convention provides:

> The contracting states undertake to cooperate among themselves by taking all measures that they may
> consider effective, under their own laws, and especially those established in this convention, to *prevent
> and punish* acts of terrorism, especially kidnapping, murder, and other assaults against the life or physical
> integrity of those persons to whom the state has the duty according to international law to give special
> protection, as well as extortion in connection with those crimes.

27 U.S.T. at 3958 (emphasis added).

[7] It might be argued that the broad preventive obligations of the two conventions do not necessarily apply to
the "official guests" covered by the implementing criminal statutes because official guests are protected under those
statutes but not under the conventions themselves. Such an argument fails because Congress explicitly intended
for designated "official guests" to receive the same protections extended to persons protected under the conventions.
*See* S. Rep. No. 92–1105, at 7, 9, 15 (1972), *reprinted in* 1972 U.S.C.C.A.N. 4316, 4318, 4324–25 ("1972 Senate
Report"); H.R. Rep. No. 94–1614, at 5–6 (1976), *reprinted in* 1976 U.S.C.C.A.N 4480, 4483–84 ("1976 House
Report").

A series of amendments introduced in the Senate Judiciary Committee, however, expanded the Act to encompass crimes against "official guests" of the United States. The legislative history of these amendments makes clear that they were intended to help "protect" members of an "Olympic contingent" visiting the United States.[8] The Senate Report on the 1972 legislation, for example, contained the following description of the Judiciary Committee amendments that extended the Act's protection to "official guests":

> The first series of committee amendments extend this umbrella of Federal protection to other "official guests" of the United States as designated by the Secretary of State so as to authorize expanded *protective*, investigative and other law enforcement services for the benefit of private citizens visiting our country pursuant to official recognition by the United States.

1972 Senate Report at 7, *reprinted in* 1972 U.S.C.C.A.N. at 4316 (emphasis added).

The Report went on to detail the remarks of Senator McClellan in introducing the amendment that extended the Act's coverage of official guests. *Id.* at 9, *reprinted in* 1972 U.S.C.C.A.N. at 4318–19. As Senator McClellan explained:

> The bill under consideration recognizes that the *United States as a host country has particular responsibility to protect the person and property of "foreign officials", including ambassadors, agents, employees and their families while such persons are present within our territorial confines.* However, the measure would not offer any expanded protection for foreign citizens, who might visit our shores as official guests of our country as members of an Olympic contingent.
>
> . . . .
>
> The amendment I propose will *extend the umbrella of Federal protection to cover "official guests" of the United States as designated by the Secretary of State so as to include visiting athletes in international competition.*

*Id.* (emphasis added).

---

[8] The Act was amended to include "official guests" in response to the kidnapping and murder of Israeli athletes at the Munich Olympic games. 1972 Senate Report at 9, *reprinted in* 1972 U.S.C.C.A.N. at 4318–19. In light of the protective purpose repeatedly stressed in the legislative history, it is unlikely that Congress intended only to provide federal law enforcement with authority to respond to such an attack after the fact, but not to take steps, such as screening for weapons, to prevent an attack in the first place.

**B.**

Section 2 of the IPPA added the provision authorizing the Attorney General to request the assistance of federal agencies and state governments "in the course of enforcement" of the substantive provisions of the act. The House and Senate Reports provide only terse explanation of this provision, stating that "[t]he legislation amends section 1116 [the murder and manslaughter provision] of title 18, United States Code, to authorize the Attorney General to request assistance from any federal, state or local agency in the course of enforcing the provisions of section 1116." 1976 House Report at 5, *reprinted in* 1976 U.S.C.C.A.N. at 4483 (footnote omitted). A footnote appended to the foregoing sentence, however, explains: "There may be circumstances — such as the takeover of an embassy — when the Justice Department will need assistance from other federal, State or local agencies." *Id.* at n.7, *reprinted in* 1976 U.S.C.C.A.N. at 4483. This sentence provides further evidence that Congress intended the Attorney General to obtain assistance for preventive, as well as prosecutorial, enforcement of the covered statutes. Significantly, it cites the takeover of an embassy as a situation in which assistance may be provided in the enforcement of § 1116 — which prohibits *murder* and *manslaughter* of the protected persons. The takeover of an embassy, however, does not necessarily involve the commission of murder or manslaugter of a protected person; rather, it presents a situation where enhanced resources are necessary to *prevent* the commission of such crimes.

In addition to the foregoing, President Ford's statement on signing the IPPA stressed that "[p]reventing or punishing" acts of international terrorism "is a prime concern of this Government." 3 Pub. Papers of Gerald Ford 2479 (1976). The President further stated:

> The Act for the Prevention and Punishment of Crimes Against Internationally Protected Persons (H.R. 15552) will serve as a significant law enforcement tool for us to deal more effectively with the menace of terrorism, and it will assist us in discharging our important responsibilities under the two international conventions which I am today authorizing for ratification.

*Id.* at 2480. As shown above, the *prevention* of crimes against protected persons is among the United States' "responsibilities" under the conventions, and therefore under the Act as well.

**IV.**

In a 1980 Opinion, this Office concluded that the IPPA does not authorize the Attorney General to obtain the assistance of the Armed Forces "to protect foreign

dignitaries . . . present in New York for [an] opening session of the United Nations." *See* Memorandum for Paul R. Michel, Associate Deputy Attorney General, from Larry L. Simms, Deputy Assistant Attorney General, *Re: Request for Assistance to Protect Foreign Dignitaries* (Sept. 11, 1980). The 1980 opinion expressed the view that the Act was adopted to discharge our obligation under the two international conventions discussed above, but read those conventions to require only that signatories either extradite or prosecute those found within their territory who have committed an offense against an internationally protected person. The opinion, accordingly, concluded that the IPPA does not authorize the Attorney General to request assistance from the Armed Forces or any other agency "to provide protective custody or other routine assistance to foreign officials in the absence of an imminent or actual criminal offense." *Id.* at 2. Finally, the opinion conceded that "enforcement and protection responsibilities" will at times overlap, but concluded that, absent an "actual threat or imminent harm," these responsibilities are distinguishable and that it is not appropriate to use the Act to provide purely "protective service." *Id.* at 3.

For the reasons discussed above, we do not read the IPPA or the international conventions that it implemented as narrowly as did the 1980 opinion. To the contrary, it appears that the conventions and the IPPA were intended not simply to provide the Attorney General with the power to prosecute crimes of violence committed against "official guests" of the United States, but also to take "practicable measures to prevent preparation[ ]" for such violent acts. *See, e.g.*, Article 4, Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, 28 U.S.T. at 1979. In our view, the operation of metal and weapons detectors at the Olympic games constitutes a good example of the type of reasonable steps that might be taken to prevent the ultimate preparation for the commission of a violation of §§ 112, 1116, and 1201 of the Criminal Code. To the extent the 1980 opinion is inconsistent with this view, that opinion is hereby superseded.

Finally, we note that even the 1980 opinion seems to recognize that the Attorney General may request the assistance of federal agencies under the IPPA in responding to an actual threat. We understand that some generalized threats of violence have been directed at the Atlanta Olympics. The Attorney General has "great discretion to decide how to enforce the law," 4B Op. O.L.C. at 353, and is, in our view, best suited to determine the appropriate response to these threats. Indeed, even without an express and tangible threat, the Attorney General might reasonably conclude that history (e.g., the tragic precedent of Olympic terrorism created at the Munich Olympic Games of 1972), world events, and other pertinent background information give rise to a "threat" of violence at the Olympic Games. Thus, even under the more restrictive view of the IPPA articulated in the 1980

opinion, we believe that the Attorney General has authority to request the assistance of other federal agencies under the circumstances described above.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*